USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ Nos. 93-1290 93-1520 BOSTON BEER COMPANY LIMITED PARTNERSHIP, D/B/A THE BOSTON BEER COMPANY, Plaintiff, Appellant, v. SLESAR, BROS. BREWING COMPANY, INC., D/B/A BOSTON BEER WORKS, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Cyr, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ William O. Hennessey, with whom Richard A. Savrann and Burns & _____________________ __________________ ________ Levinson were on brief for appellant. ________ Martin J. O'Donnell, with whom Cesari and McKenna were on brief ____________________ ___________________ for appellee. ____________________ November 16, 1993 ____________________ BOWNES, Senior Circuit Judge. Plaintiff-appellant, BOWNES, Senior Circuit Judge. _____________________ The Boston Beer Company, sought to enjoin defendant-appellee, Boston Beer Works, from using the words "Boston Beer" in its name, and from using the word "Boston" in connection with any of its beers. Appellant contended that appellee's name was confusingly similar to its own, and would mislead the public into thinking that Boston Beer Works' products or services originated or were associated with those of The Boston Beer Company. The district court rejected this claim, concluding that appellant's marks "Boston Beer," as used in its name, and "Boston," as used in connection with a number of its products, were not entitled to trademark protection. We affirm. I. I. __ BACKGROUND BACKGROUND __________ Appellant is a beer manufacturer. In 1985 appellant began brewing Samuel Adams Boston Lager at a brewery in Pittsburgh, Pennsylvania under the name "Boston Beer Company." The Pittsburgh facility was independently owned, and appellant operated it as a contract brewer, namely, one who engages another to manufacture beer in a brewery owned by the other. Presently, appellant has contract breweries in Pittsburgh, Utica, New York, and Portland, Oregon. -2- 2 In November 1988 appellant first began to brew its own beer at a brewery located in Boston. This also marked the first time that appellant actually brewed any beer in the city that shares its name. Appellant has, however, always called Boston its corporate home, and virtually all of its assets and non-sales employees can be found in Massachusetts. Appellant's "Boston" brews are not limited to Samuel Adams Boston Lager. In fact, appellant has what it refers to as a "family" of "Boston" beers. In addition to Samuel Adams Boston Lager, other members of this family are Boston Lightship, which appellant began marketing in September 1987, and Samuel Adams Boston Ale, which appellant began marketing in October 1988.1 Appellant's beers are marketed and distributed throughout the United States and abroad. Appellant sells its beers to restaurants, bars, package stores and grocery stores for resale; it does not make any sales directly to the public. Over the past five years appellant has spent substantial amounts of money promoting its products in the Boston area. From 1988 through 1992, appellant spent ____________________ 1. This is not, however, the extent of appellant's brews. In fact, appellant sports an entire line of "Samuel Adams" beers, including: "Samuel Adams Cranberry Lambic," "Samuel Adams Cream Stout," "Samuel Adams Double Bock," "Samuel Adams Triple Bock," "Samuel Adams Oktoberfest," "Samuel Adams Wheat Brew," "Samuel Adams Winter Ale" and "Samuel Adams Winter Lager." -3- 3 approximately $350,000 in advertising on major Boston radio stations. Among the various other promotional means used by appellant are billboards, print advertising, and sales of promotional materials such as coasters, balloons, hats, table tents and table tent holders. By 1992 appellant's total sales in the Boston area had exceeded $3 million and its total sales had exceeded $20 million. Appellee is a restaurant and brew pub. On April 10, 1992, it opened for business on Brookline Avenue in the Kenmore Square section of Boston, directly across the street from Fenway Park, home of the Boston Red Sox. As a brew pub, appellee is a licensed restaurant that brews beer on-site for consumption by its patrons. One of the beers brewed by appellee is named "Boston Red." In addition to brewing and serving its own beers, appellee offers a wide range of food. Appellant commenced this action on April 14, 1992 alleging trademark and trade name infringement, misappropriation and unfair competition pursuant to 43(a) of the Lanham Act, 15 U.S.C. 1125(a), the general laws of the Commonwealth of Massachusetts and common law. The first amended complaint alleged, inter alia, that appellee's _____ ____ "adoption of `BOSTON BEER WORKS' made with knowledge of Plaintiff's prior use of the trademark and trade name `BOSTON BEER COMPANY' and its `BOSTON BRAND' family of trademarks ...." constitutes a violation of 43(a) of the Lanham Act. -4- 4 First Amended Complaint at 17. On April 15 appellant moved for a temporary restraining order to stop appellee from using the names "Boston Beer Works" and "Boston Red." The motion was denied the same day. On April 21 appellant moved for a preliminary injunction. After two days of hearings and argument the district court denied the motion. In a Memorandum and Order dated June 18, 1992 (the "June Memorandum"), the district court found that the appellant's marks were not entitled to trademark2 protection. The district court found first that "plaintiff's `BOSTON BEER' mark as used in its name `BOSTON BEER COMPANY' is sufficiently descriptive so as not to be considered generic and thus unprotectable." June Memorandum at 9. Next, the court found that "plaintiff's `BOSTON' mark as used in its `SAMUEL ADAMS BOSTON' beers and its `BOSTON LIGHTSHIP' beer is a descriptive term." In fact, the court found that appellant did not even contend that its marks were anything but descriptive. Id. Therefore, the court stated, in order ___ to satisfy its burden of establishing that its marks are ____________________ 2. For purposes of this opinion, the term trademark includes trade names as well. Although there are differences between the two concerning, inter alia, registration under _____ ____ the Lanham Act, the differences are not relevant to our decision in this case. See Union National Bank, Laredo v. ___ ____________________________ Union National Bank, Austin, 909 F.2d 839, 841 n.2 (5th Cir. ___________________________ 1990) (citing Blinded Veterans Assoc. v. Blinded American ________________________ ________________ Veterans Foundation, 872 F.2d 1035, 1040 n.11 (D.C. Cir. ____________________ 1989)). -5- 5 entitled to trademark protection, "[p]laintiff must still make a showing, under a likelihood standard, that its name and marks have acquired secondary meaning." Id. ___ After reviewing the relevant preliminary injunction considerations, the court concluded that appellant had "not shown a likelihood of establishing by a preponderance of the evidence a secondary meaning for `BOSTON BEER' and `BOSTON.'" Id. at 15. Specifically, the court found that although ___ appellant had been using the name "Boston Beer Company" and the term "Boston" in connection with Samuel Adams Boston Lager since late 1985, not all of appellant's promotional materials contained "The Boston Beer Company" name, and those that did, always used it along with another of appellant's beer marks. "For example," the court pointed out, "on the cards plaintiff prints to be inserted into table tents for restaurants and bars, the `BOSTON BEER COMPANY' name appears on the bottom of the card with plaintiff's `SAMUEL ADAMS' logo and its slogan `The Best Beer in America' appearing at the top of the card." June Memorandum at 11. Moreover, the court found that all of the promotions that did include the company's name, "place[d] the name on the bottom and in smaller type than the rest of the words on the promotional item." Id. ___ As far as the labels appearing on each of appellant's three "Boston" beers, the court noted that -6- 6 "Boston" did in fact appear in each of the beers' names. In addition, the court found that each beer's bottle label contained an illustration or logo, and that, on bottles of Samuel Adams Boston Lager and Boston Lightship, the words "Samuel Adams" and "Lightship" were in larger print than the words "Boston Lager" and "Boston," respectively. Finally, the court found that the name "Boston Beer Company" appeared at the bottom of all appellant's labels in a smaller type than either the illustration or the other words on the label. It was undisputed that appellant engaged in substantial advertising and promotion of its products in the Boston area. The court found, however, that appellant's efforts were "focused in the direction of promoting a connection between 'SAMUEL ADAMS' and plaintiff's products[,]" and not towards establishing a connection between the terms "Boston Beer" and "Boston" and its beer products. Id. at 15-16. In reaching this result, the court ___ examined appellant's billboards, radio advertisements, various promotional paraphernalia, and a promotional brochure. Finally, the court pointed out that the vast majority of appellant's advertising is directed towards its best-selling brand, Samuel Adams Boston Lager, and that appellant produces other "Samuel Adams" beers that are not part of its "Boston" family. As the court also observed, [t]he fact that plaintiff produces other Samuel Adams beers, with the same Samuel -7- 7 Adams logo as appears on its "Samuel Adams Boston Lager" and "Samuel Adams Boston Ale" beer labels, but without the "BOSTON" family name, reduces the likelihood that a consumer will associate "BOSTON" or "BOSTON BEER" with plaintiff's products. June Memorandum at 14-15. In summary, the court found that, notwithstanding the duration of appellant's use of the "Boston Beer Company" name and the term "Boston" in connection with three of its products, it had not directed its advertising and promotional activities to creating a connection between "Boston Beer" and its products, and had not made efforts at promoting a connection between "Boston" and its products, and therefore it had not shown a likelihood of establishing secondary meaning. On February 9 and 10, 1993 a non-jury trial was held, at the conclusion of which the court gave its decision from the bench. The sole issues litigated were: (1) whether secondary meaning had attached to "Boston" and "Boston Beer," and (2) if so, whether a likelihood of consumer confusion existed. Appellant's principal evidence at trial consisted of a consumer survey. The survey was conducted among 400 "beer drinkers" from the greater-Boston area who were split into two groups of 200. Each group was provided with a choice of approximately 20 beers and asked to identify the beer or beers produced by each of three different "beer companies." -8- 8 Both groups were asked about the "Latrobe Brewing Company" and the "Anheuser-Busch company." One group was asked about Boston Beer Company and the other about Boston Beer Works. Included on the list were appellant's three "Boston" beers which appeared as "Samuel Adams beer," "Boston Ale," and "Lightship." The other beers consisted of various domestic and imported brands. When asked what brand of beer was produced by Boston Beer Company, 36% responded with Samuel Adams beer. Boston Ale and Lightship each garnered 4%, and 59% responded that they did not know. Similarly, for the group asked about Boston Beer Works, 31% responded with Samuel Adams, 4% with Boston Ale, 2% Lightship and 66% could not identify any brand. After hearing all of the evidence, the court found: The principal difference between the evidence that was before me at the time of the preliminary injunction hearing and the evidence that is before me in the full development of the case here on trial is the addition of the survey evidence that the plaintiff has offered. I find that that is not sufficient to establish a secondary meaning and indeed as fact finder I find that it does not even strongly support an inference of secondary meaning. The court went on to identify what it felt were two problems with the survey. First it had trouble drawing inferences favorable to appellant from the survey because -9- 9 participants were told that they were going to be asked questions about beer "companies" as opposed to a neutral term such as "producers" or "brewers." Second and more importantly, the district court found that the survey results simply did not provide strong support for an inference of secondary meaning. In a lengthy colloquy with appellant's trial counsel the district court explained that "[a] strong inference I draw from this is that when the interviewee is prompted by three words, two of which are 'Boston Beer,' a third of them come back with 'Samuel Adams'." "Is that enough" the court queried, "if [the interviewees are] just associating Samuel Adams with somebody who produces beer in Boston ...." In other words, the court found that the survey provided a strong inference of an association between product and place, but not between product and source.3 This association, the court believed, explained the fact that similar percentages associated Samuel Adams with Boston Beer Company and Boston Beer Works. According to the court, the results support[ed] an inference of uncertainty, if not confusion, as between Boston Beer Works and Boston Beer Company, but that is not the issue that is decisive of the ____________________ 3. On this point, the district court commented: "Well, don't people associate Samuel Adams with Boston, at least any of them who have their American history course still in mind?" The court added that this might particularly be the case with, "upper-scale Samuel Adams beer drinkers[.]" Appendix at 608. -10- 10 adequacy of the evidence before me to show secondary meaning. So taking into account that evidence along with all the other evidence before me, I find by a preponderance of the evidence that there has not been an establishment of a secondary meaning that associates the product with Boston Beer Company. Because the trial court found that appellant had failed to meet its burden on secondary meaning, the court did not reach the issue of likelihood of confusion. This appeal followed. II. II. ___ DISCUSSION DISCUSSION __________ Appellant argues that the district court committed legal error by failing to make an independent finding that the marks lack "inherent distinctiveness," to go along with its finding that the marks "Boston" and "Boston Beer" were descriptive. Alternatively, appellant contends that, even if the court did not commit any legal error on this front, its finding that the marks are descriptive was clearly erroneous. Next, appellant argues that the district court's finding that the survey was not highly probative of secondary meaning was clearly erroneous. Alternatively, appellant contends that the district court misunderstood the doctrine of secondary meaning. Finally, appellant argues that the survey, standing alone or together with the other evidence, established a likelihood of confusion as a matter of law, and therefore the court's finding that its marks lacked secondary meaning was illogical. -11- 11 Neither mark over which appellant asserts exclusive rights - "Boston Beer" and "Boston" - are registered. Therefore the present claim is based upon 43(a) of the Lanham Act which covers unregistered trademarks.4 Section 43(a) prohibits any person from using in connection with any goods ... or any container for goods, ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person. 15 U.S.C. 1125(a). It is settled that 43(a) of the Lanham Act protects qualifying unregistered marks, and that the general principles qualifying a mark for registration under 2 of the Lanham Act are generally applicable in determining whether an unregistered mark is entitled to protection under 43(a). Two Pesos, Inc. v. Taco Cabana, _______________ ____________ Inc., __ U.S. __ , 112 S. Ct. 2753, 2757 (1992). ____ A court's inquiry into whether a term merits trademark protection starts with the classification of that term along the spectrum of "distinctiveness." At one end of the spectrum there are generic terms that have passed into common usage to identify a product, such as aspirin, and can ____________________ 4. A trademark is defined as "any word, name, symbol, or device, or any combination thereof used by a person to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. 1127. -12- 12 never be protected. Two Pesos, 112 S. Ct. at 2757; Miller _________ ______ Brewing Co. v. Falstaff Brewing Co., 655 F.2d 5, 7-8 (1st ___________ _____________________ Cir. 1981). In the middle there are so-called descriptive terms, such as a geographical term, which can be protected, but only if it has acquired "secondary meaning" by which consumers associate it with a particular producer or source. Two Pesos, 112 S. Ct. at 2757; Volkswagenwerk AG v. Wheeler, _________ _________________ _______ 814 F.2d 812, 816 (1st Cir. 1987). At the other end of the spectrum, there are suggestive, arbitrary and fanciful terms that can be protected without proof of secondary meaning. These terms are considered "inherently distinctive." Two ___ Pesos, 112 S. Ct. at 2757; see Wiley v. American Greetings _____ ___ _____ __________________ Corp., 762 F.2d 139, 141 (1st Cir. 1985) ("a design is _____ considered 'inherently distinctive' if it is fanciful or arbitrary") (footnotes omitted). Once the determination has been made that a term is entitled to trademark protection, the pivotal inquiry becomes whether the allegedly infringing mark is likely to cause consumer confusion. See Boston Athletic Assoc. v. Sullivan, ___ ______________________ ________ 867 F.2d 22, 28 (1st Cir. 1989); Wheeler, 814 F.2d at 817. _______ That is, whether a consumer is likely to believe that Boston Beer Works' products are in fact produced by The Boston Beer Company. Whether a term is generic, descriptive, or inherently distinctive is a question of fact. See Wiley, 762 ___ _____ -13- 13 F.2d at 141. Similarly, whether a mark has acquired secondary meaning is also a question of fact. Wheeler, 814 _______ F.2d at 816. Accordingly, the district court's findings on both of these questions are subject to review only for clear error. Atlantic Track & Turnout Co. v. Perini Corp., 989 _____________________________ _____________ F.2d 541, 543 (1st Cir. 1993). As this court has previously noted, "[t]he clear error hurdle is ... quite high." Lenn v. Portland School ____ _______________ Committee, 998 F.2d 1083, 1087 (1st Cir. 1993). Of course, a _________ district court's rulings of law are reviewed de novo. Id. __ ____ ___ A. Inherent Distinctiveness A. Inherent Distinctiveness ________________________ At the outset, appellant contends that its marks are inherently distinctive, as opposed to descriptive, and are therefore entitled to trademark protection without proof of secondary meaning. Because we hold that appellant has failed to preserve the issue of inherent distinctiveness for appeal, we decline to reach the merits of its contentions. The law in this circuit is crystalline: a litigant's failure to explicitly raise an issue before the district court forecloses that party from raising the issue for the first time on appeal. See McCoy v. Massachusetts ___ _____ _____________ Institute of Technology, 950 F.2d 13, 22 (1st Cir. 1991), ________________________ cert. denied, 112 S. Ct. 1939 (1992). _____ ______ After scouring the record, we have failed to uncover a single instance, either orally or through -14- 14 submission, where appellant advocated that its marks were anything but descriptive. From the very outset of this litigation appellant had pitched its case on the theory that its marks are descriptive, that they have attained secondary meaning, and are thus entitled to trademark protection. The trial below proceeded on the common understanding that the marks were descriptive; and appellant acknowledged that secondary meaning and likelihood of confusion were the only triable issues. Moreover, after rendering its bench decision, the trial court asked appellant if any additional findings were necessary in order to address all of its claims, and appellant did not request a finding on inherent distinctiveness. According to appellant, it preserved this issue by underlining, and thereby objecting to, appellee's proposed pre-trial finding that the marks were "neither arbitrary nor fanciful." Appendix at 444. We have little trouble in finding that the act of underlining is insufficient to preserve this issue for appeal. See Rodriguez-Pinto v. ___ _______________ Tirado-Delgado, 982 F.2d 34, 41 (1st Cir. 1993) ("arguments ______________ made in a perfunctory manner below are deemed waived on appeal"). Because we see no reason to diverge from our customary practice, we treat this argument as waived. B. Secondary Meaning B. Secondary Meaning _________________ -15- 15 Because appellant's marks are descriptive, they are entitled to trademark protection only upon a showing of secondary meaning. Secondary meaning refers to a word's, or a sign's, ability to tell the public that the word or sign serves a special trademark function, namely, that it denotes a product or service that comes from a particular source. Words and phrases, in ordinary, non-trademark, use normally pick out, or refer to, particular individual items that exhibit the characteristics that the word or phrase connotes (without specific reference to the item's source). DeCosta v. Viacom International, Inc., 981 F.2d 602, 606 (1st _______ __________________________ Cir. 1992), cert. denied, 113 S. Ct. 3039 (1993); see also _____ ______ ___ ____ Wheeler, 814 F.2d at 816 ("words which have a primary meaning _______ of their own ... may by long use in connection with a particular product, come to be known by the public as specifically designating that product") (quoting Volkswagenwerk AG v. Rickard, 492 F.2d 474, 477 (5th Cir. __________________ _______ 1974)); President & Trustees of Colby College v. Colby _________________________________________ _____ College-N.H., 508 F.2d 804, 807 (1st Cir. 1975) (a name has ____________ achieved secondary meaning when "a significant quantity of the consuming public understand the name as referring exclusively to the appropriate party"). Accordingly, secondary meaning has been established in a geographically descriptive mark where the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source. Burke-Parsons- ______________ -16- 16 Bowlby Corp. v. Appalachian Log Homes, 871 F.2d 590, 595 (6th ____________ _____________________ Cir. 1989) (citing American Footwear Corp. v. General __________________________ _______ Footwear Co. Ltd., 609 F.2d 655 passim (2d Cir. 1979), cert. _________________ ______ _____ denied, 445 U.S. 951 (1980)). ______ "Proof of secondary meaning entails vigorous evidentiary requirements." Perini Corp. v. Perini ______________ ______ Construction, 915 F.2d 121, 125 (4th Cir. 1990) (quoting ____________ Thompson Medical Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d _____________________ ____________ Cir. 1985)); see Bank of Texas v. Commerce Southwest, Inc., ___ ______________ _________________________ 741 F.2d 785, 787 (5th Cir. 1984) (evidentiary burden necessary to establish secondary meaning for a geographically descriptive term is substantial). Moreover, it is the party seeking protection of a mark who bears the burden of proving that secondary meaning has attached. Bristol-Meyers Squibb _____________________ Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1041 (2d Cir. ___ ____________________ 1992); Blinded Veterans Assoc., 872 F.2d at 1041. _______________________ To establish secondary meaning in the mark "Boston," not only must appellant prove that, when read or heard by consumers in connection with beer, "Boston" no longer means that the beer was brewed in Boston or by a Boston-based brewer, but that the consuming public recognizes that the word "Boston" identifies appellant as the source of the beer. Similarly, with respect to the mark "Boston Beer," as used in appellant's name, The Boston Beer Company, -17- 17 appellant must prove that a substantial portion of the consuming public associates those words specifically with appellant's business. See Perini Corp., 915 F.2d at 125. ___ ____________ "But secondary meaning cannot be recognized where, despite a degree of association between the mark and the producer, the original meaning remains dominant; so long as the mark remains descriptive in its primary significance, subsidiary connotations cannot justify trademark treatment." R. Callmann, Unfair Competition, Trademarks and Monopolies, _______________________________________________ 19.26 at 144 (4th ed. 1989); see Burke-Parsons-Bowlby Corp., ___ __________________________ 871 F.2d at 595 (geographically descriptive term lacks secondary meaning if it still primarily denotes a geographic area as opposed to a single source). Among the factors this court generally looks to in determining whether a term has acquired secondary meaning are: (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture. Wheeler, 814 F.2d at 816 (quoting Volkswagenwerk AG v. _______ __________________ Rickard, 492 F.2d at 478). Proof relating to these factors _______ constitutes circumstantial evidence from which a court must draw reasonable inferences. In its bench decision, the district court found, and appellant does not dispute, that, -18- 18 except for the survey, the evidence of secondary meaning was not materially different at trial than it was at the preliminary injunction hearing. The court then concluded that the addition of the survey to the circumstantial evidence did not alter its prior findings, and that appellant had not met its burden of establishing secondary meaning. In its brief appellant does not explicitly address the court's earlier findings. Instead, appellant alleges that the court's treatment of the survey is grounds for reversing its finding on secondary meaning. We turn to the survey. Survey evidence has become a well-recognized means of establishing secondary meaning. See President and ___ ______________ Trustees of Colby College, 508 F.2d at 809; Papercutter, Inc. _________________________ _________________ v. Fay's Drug Co., Inc., 900 F.2d 558, 564 (2d Cir. 1990). _____________________ In fact, consumer surveys and testimony are the only direct evidence on this question. See International Kennel Club v. ___ __________________________ Mighty Star, Inc., 846 F.2d 1079, 1085 (7th Cir. 1988). __________________ Appellant explains its survey in three steps. First, appellant points to the percentage of participants, 36 and 31 percent respectively, who identified The Boston Beer Company and Boston Beer Works as the producer of Samuel Adams beer. Next, appellant contends that this correlation proves that the public associates Samuel Adams beer with the words "Boston Beer." Finally, appellant concludes that secondary meaning has been established because whenever a consumer sees -19- 19 or hears the term "Boston Beer," it will associate the product with the brewer of Samuel Adams beer. The district court found that the survey did not bridge the logical gap between steps two and three. Our examination of the survey and its results convinces us that, while the survey might provide some evidence of secondary meaning, the district court's treatment of the survey was not clearly erroneous. The court's finding, that the survey results demonstrate a product-place association as opposed to a product-source association, is ______ not inconsistent with the survey results, and provides a viable alternative to the explanation proffered by appellant. Just because one-third of those surveyed, when presented with a list of beers and a brewer whose name contained the words "Boston Beer," matched that brewer with Samuel Adams beer, does not mean that the words "Boston Beer," used in connection with appellant's name, have necessarily assumed a secondary meaning. It is just as ___________ probable, as the district court lucidly explained, that appellant's marks are still primarily perceived by consumers as geographically descriptive terms, and that consumers are simply aware of the fact that Samuel Adams is a Boston beer.5 Moreover, the district court observed that the ____________________ 5. Even assuming that appellant's reading of the survey results is the correct one, a positive response rate of 36% is hardly overwhelming. See generally Callmann, supra, ___ _________ _____ -20- 20 survey was somewhat suggestive in that it gave the impression that Boston Beer Works was a "company," like Anheuser-Busch and Latrobe, as opposed to a restaurant/brew pub. Furthermore, if the survey unequivocally establishes secondary meaning in the marks "Boston Beer" and "Boston," then we are at a loss to understand why, when 36% of those surveyed thought that Samuel Adams beer was brewed by The Boston Beer Company, only 4% of the same group thought that Boston Ale was also produced by that company.6 If the marks have acquired secondary meaning, the same people who selected Samuel Adams as one of appellant's brews should have selected Boston Ale as well. Because the district court's ultimate finding on secondary meaning was based upon its consideration of circumstantial as well as direct evidence, we briefly discuss the former. We have already set forth the relevant factors for considering circumstantial evidence of secondary meaning, as well as the district court's thorough analysis of the evidence thereunder. The district court's finding that the circumstantial evidence of secondary meaning did not support an inference favorable to appellant is well-supported. ____________________ 19.27.50 at 205 (collecting cases). 6. Additionally, it is possible that there was no overlap between the people who selected Samuel Adams beer and those who selected Boston Ale. -21- 21 After reviewing the entire record, placing particular emphasis on appellant's survey, we can find no error, clear or otherwise, in the district court's finding that appellant failed to carry its burden of proving secondary meaning. Next appellant argues that the trial court committed legal error by "rejecting" the survey for "failure to show any consumer identification of `company'." According to appellant this was a mistake because the Lanham Act does not require that the consumer actually know the producer's name. As a preliminary matter, appellant is incorrect when it states that the district court "rejected" the survey. The district court accepted the survey into evidence and gave it careful consideration before concluding that the survey did not provide a basis for a finding of secondary meaning. Furthermore, appellant incorrectly attributes a legal error to the court. At the risk of repeating ourselves, the district court found that appellant had not met its burden of proving that its marks had come to identify a single source of beer as opposed to simply identifying a geographic origin. This finding does not rest upon an erroneous view of the law. Finally, appellant tries to execute an end-run around the district court's finding on secondary meaning. Appellant maintains that because the survey demonstrates a -22- 22 likelihood of consumer confusion between The Boston Beer Company and its products and Boston Beer Works and its products, secondary meaning must exist. While it is true that a finding of a likelihood of confusion could only occur in this case if secondary meaning had attached to appellant's marks, appellant's argument places the cart before the Clydesdale. The district court found that appellant's marks were not entitled to trademark protection because they had not attained secondary meaning. Accordingly, that court did not need to address the question of likelihood of confusion. The determination as to whether a likelihood of confusion exists is a question of fact. See Aktiebolaget Electrolux v. ___ _______________________ Armatron International, Inc., 999 F.2d 1, 3 (1st Cir. 1993) _____________________________ (citing Keds Corp. v. Renee International Trading Corp., 888 __________ _________________________________ F.2d 215, 222 (1st Cir. 1989)). This determination is generally based upon eight separate factors, each of which requires its own factual findings. See id. (setting out the ___ ___ eight factors). Because we affirm the district court's finding on secondary meaning, we need not address the issue of likelihood of confusion. Affirmed. Affirmed. ________ -23- 23