**Jean MARIE–BINUCCI and Binuscan, Inc., Plaintiffs,**

v.

**George ADAM d/b/a Monaco Systems and Monaco Systems, Inc., Defendants.**

Civ. A. No. 94–12243–EFH.

United States District Court, D. Massachusetts.

Dec. 19, 1995.

Robert O. Berger, III, Boston, MA, James P. Duffy, III, Mineola, NY, for Jean–Marie Binucci, Binuscan, Inc.

Joseph V. Mahoney, Hatem & Mahoney, North Andover, MA, Arnold B. Podgorsky, Wright & Talisman, Washington, DC, for George Adam, dba Monaco Systems, Inc., Monaco Systems, Inc., George Adam.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

This case is before the Court on the Defendants' Motion for Summary Judgment on the plaintiffs' first two causes of action alleging violation of the Lanham Act, Title 15, United States Code, Section 1125(a), and on a third cause of action sounding in unfair competition. The defendants also move to dismiss the fourth cause of action, alleging a false accounting under state law, on the ground of lack of subject matter jurisdiction.

■ In a motion for summary judgment, the Court reviews the facts in a light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970). The Plaintiff, Jean Marie Binucci, is a French citizen who lives in the Principality of Monaco. He is a commercial printer who owns Imprimerie Binucci, a specialty printing company, also located in Monaco. Mr. Binucci created "Binuscan," an automated color correction and separation computer software program. The Plaintiff, Binuscan, Inc., is a New York corporation whose sole shareholder is Mr. Binucci. Its principal business is the development and marketing of the "Binuscan" product in North America. The Defendant, George Adam, lives in Boston, Massachusetts, and operates a business called "Monaco Systems, Inc.," a North Andover, Massachusetts corporation organized under the laws of this state.

On January 28, 1993, Plaintiff Binucci entered into a contract with the Defendant Adam and a Mr. Eric Wilsterman. This written agreement stated that Mr. Adam and Mr. Wilsterman would have exclusive rights to distribute "Binuscan" software in North America. Eventually, this agreement proved unworkable for all the parties involved. On or before September 27, 1993, the parties agreed to terminate the distribution agreement and signed a written termination agreement on February 4, 1994.

At some time either before or after the signing of the termination agreement,[1] Defendant Adam developed a commercial automated color correction and separation computer program of his own called "MonacoColor." This product competes with "Binuscan" for business in the commercial printing software marketplace. The plaintiffs assert that the product "MonacoColor" is derived from "Binuscan" and its name was intended to deceive consumers into thinking that it was a successor to "Binuscan."

Mr. Binucci and Binuscan, Inc., brought this action against Mr. Adam and Monaco Systems, Inc., alleging four causes of action. The first two causes of action allege infringement of an unregistered trade name under the Lanham Act, 15 U.S.C. § 1125(a). Count III alleges unfair competition. These three causes of action arise from Mr. Adam's and Monaco Systems, Inc.'s, use of the word

---

1. Each of the parties asserts different reasons for the failure of the distribution agreement and the circumstances surrounding the signing of the termination agreement. Because these facts do not apply to the Lanham causes of action, the Court has not considered them in its finding. The Court mentions them only in passing for purposes of providing a factual background.

"Monaco" and the use of "Monaco" in the name of the "MonacoColor" product and in the name of Monaco Systems, Inc., itself. Plaintiffs claim a protectible interest in the name "Monaco" because Mr. Binucci resides there and "Binuscan" is manufactured there. The fourth cause of action alleges a false accounting concerning the prior distribution relationship between the plaintiffs and the defendants.

The Court may grant summary judgment if no "genuine issue" of material fact exists and the evidence entitles the moving party to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). A moving party must show that "there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the opponent of the motion and that party must establish the existence of a genuine issue for trial. *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989).

Title 15 U.S.C. § 1125(a) prohibits anyone from using:

> ... in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake ... with another person ... or commercial activities by another person ...

In *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175 (1st Cir.1993), the United States Court of Appeals for the First Circuit examining a Section 1125(a) claim stated:

> A court's inquiry into whether a term merits trademark protection starts with the classification of that term along a spectrum of "distinctiveness." At one of the spectrum there are generic terms that have

passed into common usage to identify a product, such as aspirin, and can never be protected. In the middle of this spectrum are so-called descriptive terms, *such as a geographic term*, which can be protected, but only if it has acquired 'secondary meaning' by which consumers associate it with a particular producer or source. At the other end of the spectrum, there are suggestive, arbitrary and fanciful terms that can be protected without proof of secondary meaning. These terms are considered "inherently distinctive."

*Id.* at 180 (emphasis added, citations omitted). Monaco is a geographic word, and, therefore, it has descriptive term status requiring secondary meaning in order to warrant trademark protection.[2]

The First Circuit Court of Appeals has defined secondary meaning as:

> ... a word's, or a sign's, ability to tell the public that the word or sign serves a special trademark function, namely, that it denotes a product or service that comes from a particular source. Words and phrases, in ordinary, non-trademark, use normally pick out, or refer to, particular individual items that exhibit the characteristics that the word or phrase connotes (without specific reference to the item's source). Accordingly, secondary meaning has been established in a geographically descriptive mark where the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source.

*Boston Beer Co.*, 9 F.3d at 181 (citations omitted) "A trademark that is primarily geographically descriptive must have acquired secondary meaning to invoke the protection of the Lanham Act." *Burke–Parsons–Bowlby v. Appalachian Log Homes*, 871 F.2d 590, 595 (6th Cir.1989). Proof of secondary meaning requires "vigorous evidentiary requirements" and the party seeking protection of the mark bears the burden of proving that secondary meaning has attached. *Boston*

---

2. "Monaco" cannot qualify as a suggestive, arbitrary or fanciful term. In fact, the defendants provided evidence of some six hundred companies that use "Monaco" in product names. *Second Affidavit of George Adam, July 14, 1994.* This included approximately forty trade and service mark "Monaco" registrations or attempted registrations with the United States Patent Office and approximately sixty "Monaco" mark registrations with the states. *Id.*

*Beer Co.*, 9 F.3d at 181. Among the factors generally looked to in determining if a term has acquired secondary meaning are:

> (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.

*Id.* at 182.

■ To establish secondary meaning in the mark "Monaco," the plaintiffs must prove that, when read or heard by consumers in connection with software, "MonacoColor" means, *not* that the software was made in Monaco or by a Monaco-based designer, but that consumers believe that "MonacoColor" is associated with "Binuscan." Such data could have been obtained, for example, with consumer survey evidence. *See, e.g., Boston Beer Co.*, at 182–83 (survey evidence considered well-recognized method of establishing secondary meaning). The plaintiffs, however, have not offered proof of any kind that consumers associate "MonacoColor" with "Binuscan." They have only submitted statements of three persons affiliated with Binuscan, Inc., saying that these individuals believe that there is confusion in the marketplace.[3] Without any showing as to secondary meaning, the plaintiffs have failed to sustain their burden.

As the Court stated in its Memorandum and Order denying the plaintiffs' request for the issue of a preliminary injunction:

> A section 43(a) Lanham Act claim [15 U.S.C. § 1125(a)] is predicated upon proof of likelihood of confusion to consumers, so that a consumer is deceived as to the identity of the person with whom the consumer is dealing. After a hearing on oral argument, the Court finds that plaintiffs have failed to establish that the public, when purchasing a $4,000 product, is confused with respect to whether MonacoColor is manufactured by, or affiliated with, Binuscan, Binuscan, Inc., or Jean–Marie Binucci. Plaintiffs presented no clear evidence that purchasers of these types of products would attribute "MonacoColor" to the Plaintiffs' "Binuscan" based on Plaintiff's residency in the Principality of Monaco, and Plaintiff's alleged reputation as printer from Monaco.

> Moreover, Plaintiffs have failed to establish that the term "Monaco" has acquired secondary meaning in the marketplace, such that consumers associate the term with the plaintiffs or their product. First, plaintiffs have not shown that they have acquired a protectible interest in the term "Monaco." Plaintiffs merely allege that, in the particular marketplace, the term "Monaco" is somehow inexorably linked to the plaintiffs and their product. Second, plaintiffs proffer no evidence to establish that consumers associate the term "Monaco" with either the term "Binuscan" or with the Plaintiff Binucci.

Memorandum and Order, January 23, 1995, *Jean–Marie Binucci and Binuscan, Inc. v. George Adam and Monaco Systems, Inc.*, (citations and quotations omitted).[4]

For the reasons set forth above, the Court hereby enters summary judgment in favor of the defendants as to Counts I, II, and III.[5] The Court denies the Defendants' Motion to Dismiss Count IV.

SO ORDERED.

---

**3.** It is the Court's own opinion, for what little it is worth, that the vision which "Monaco" conjures up is not "Binuscan" or any other computer, but rather a glamorous resort with its fashionable casino presided over by the memory of a gracious Princess where gather pleasure-seeking expatriates from the pages of Scott Fitzgerald.

**4.** Because the plaintiffs have not shown any evidence of secondary meaning, the Court does not address the issue of likelihood of confusion. *See Boston Beer Co.*, 9 F.3d at 183 (Appeals Court declining to analyze likelihood of confusion issue due to lack of secondary meaning).

**5.** The same rationale applicable to Title 15 U.S.C. § 1125(a) claims applies to the claim for unfair competition.