**LABRADOR SOFTWARE, INC., Plaintiff,**

v.

**LYCOS, INC., Defendant.**

**No. CA 98–12253–JLT.**

United States District Court, D. Massachusetts.

Jan. 12, 1999.

Victor H. Polk, Jr., Joshua M. Dalton, Bingham Dana & Gould LLP, Boston, MA, for Labrador Software, Inc., Plaintiff.

Edward F. Perlman, Wolf, Greenfield & Sacks, P.C., Boston, MA, Robert L. Kirby, Mark D. Robins, Ellen M. Majdloch, Hutchins, Wheeler & Dittmar, Boston, MA, for Lycos, Inc., Defendant.

## MEMORANDUM

TAURO, Chief Judge.

Plaintiff Labrador Software, Inc. seeks a preliminary injunction to prevent Defendant Lycos, Inc. from using the image of a black Labrador dog called "Lycos" to advertise Defendant's internet search engine.

### I. Facts

Plaintiff Labrador Software, Inc. developed and recently began marketing a purportedly cutting-edge system that retrieves information from corporate intranets. Plaintiff's system allegedly allows users to obtain information easier and faster than traditional search systems. Plaintiff avers that it has used the marks "LABRADOR," "E–RETRIEVER," "LABRADOR E–RETRIEVER," "LABRADOR SOFTWARE," and "GET ENGINE," both alone and in connection with a Labrador dog image, to market its products and services.

Defendant Lycos provides a more traditional, internet search system ("'Go Get It' Engine"). Around October 19, 1998, Defendant began airing radio and television advertisements that used the image of a black Labrador dog called "Lycos" to market its "Go Get It" Engine. On November 2, 1998, Defendant issued a press release announcing the launch of a $25 million, year-long national advertisement campaign featuring "a black Labrador retriever [called Lycos] who finds anything that the user is looking for at speeds that make searching easy and fun."

Plaintiff claims that Defendant's use of the black Labrador image called "Lycos" infringes on and dilutes Plaintiff's trademarks under both federal and state law. Plaintiff avers that Lycos's ads will confuse consumers, making some think that Plaintiff is associated with Lycos's allegedly slower "Go Get It" Engine. Plaintiff also claims that Defendant's actions amount to unfair competition and injury to business reputation, and unfair and deceptive practices under Mass. Gen. Laws ch. 93A.

Plaintiff seeks preliminary injunctive relief. For the following reasons, Plaintiff's motion is DENIED.

### II. Analysis

■ In the trademark infringement context, the dispositive issue in a preliminary injunction analysis is the plaintiff's likelihood of success on the merits. *See, e.g., Camel Hair and Cashmere v. Associated Dry Goods,* 799 F.2d 6, 14 (1st Cir.1986) (stating that once a trademark plaintiff seeking preliminary injunctive relief shows a likelihood of success on the merits, irreparable harm is presumed).[1]

---

1. The court analyzes Plaintiff's request for a preliminary injunction only under the federal trademark infringement claim, because Plaintiff devoted all of its oral argument, and the overwhelming majority of its supporting memoranda, to that claim.

■ To succeed on the merits, Plaintiff must show that: (1) its marks are entitled to trademark protection; and (2) Defendant's allegedly infringing acts create a likelihood of confusion. *See, e.g., Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.,* 9 F.3d 175, 180 (1st Cir.1993). Plaintiff cannot pass the first hurdle.

■ "A court's inquiry into whether a term merits trademark protection starts with the classification of the term along the spectrum of 'distinctiveness.'" *Id.* At one end of the spectrum are "generic" marks, which are not distinctive, and hence normally not entitled to protection. *See, e.g., Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1006 (D.Mass.1988). At the other end are "arbitrary, fanciful, or suggestive" marks, which are inherently distinctive, and hence almost always protectable. *See, e.g., Boston Beer,* 9 F.3d at 180. In between are descriptive marks, which are entitled to protection only upon a showing of secondary meaning. *See, e.g., Calamari,* 698 F.Supp. at 1006–07.

The parties in this case dispute whether Plaintiff's marks are descriptive or suggestive. "A 'descriptive' mark is one which portrays a characteristic of the article or service to which it refers.... 'Suggestive' marks, on the other hand, connote rather than describe a particular product or service and require the consumer's imagination to reach a conclusion as to the nature of the product or service." *Calamari,* 698 F.Supp. at 1006–07.

Under an abstract comparison of marks to product, a few of Plaintiff's marks appear, at first blush, to be suggestive. For example, without additional information, a consumer would likely have to use some imagination to conclude that the mark "LABRADOR" refers to a computer intranet service company.

■ The events giving rise to this lawsuit did not occur in a vacuum, however. Defendant proffers evidence showing that several other internet-related companies use (1) the word "retrieve," or some derivative thereof; and (2) images of Labrador dogs (or other dogs), in connection with their product/service.[2] The proliferation of marks identical or similar to Plaintiff's marks in the internet industry indicates that Plaintiff's marks are descriptive, rather than suggestive.[3] *See, e.g., Calamari,* 698 F.Supp. at 1008 ("In determining whether a particular word has a descriptive or suggestive significance as applied to a field of merchandise or service, it is proper to take notice of the extent to which it has been used in trademarks by others in the same field."); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:69 (4TH ed. 1996) ("[I]f others are in fact using the term to describe their products, an inference of descriptiveness can be drawn.").

■ Descriptive marks are only entitled to protection upon a showing of secondary

---

2. Defendant provided exhibits of the following products/services: (1) "Bess, Internet retriever for kids, families, and schools," (words quoted from web page), whose web page includes a large picture of what appears to be a chocolate Labrador dog; (2) "Retrieve It!," an internet search product from Macintosh whose web page includes a small picture of what appears to be a golden Labrador dog next to the words "Retrieve It!;" (3) "Black Lab Micro," a computer equipment seller/lessor whose web page includes a small picture of an indeterminate breed of dog, and two larger pictures of dog paws; (4) "Super-Dog," a product designed to commerce-enable web sites, whose web page includes a large picture of what appears to be the head of a chocolate Labrador dog next to the name "SuperDog;" (5) "Nethound," a catalog of internet resources for a limited geographic area whose web page includes three pictures of a dog of indeterminate breed, plus pictures of a dog paw and a bone; (6) "Retriever!," an internet sales tool whose web site includes a picture of a black dog of indeterminate breed next to the word "Retriever!;" (7)

"Retriever," a computer file searcher whose web page includes a picture of a yellow dog next to the product name; (8) "Retriever" and "Retriever Reader," two products designed to facilitate internet downloading, whose web site includes the product names; (9) "Retriever for Windows 95/98/NT," a product designed to download files from the internet, whose web page includes two pictures of dogs of indeterminate breed; (10) "Retriever communications," an Australian mobile applications service provider whose web site includes pictures of what appear to be black dogs.

3. Evidence that numerous other internet-related companies use similar or identical marks is highly useful, given that "[t]he line between descriptive and suggestive terms is often blurred, and [that] the categorization of a name as 'descriptive' or 'suggestive' is frequently 'made on an intuitive basis' rather than as a result of a logical analysis susceptible of articulation." *Calamari,* 698 F.Supp. at 1008.

meaning. *See, e.g., Boston Beer,* 9 F.3d at 181. To establish secondary meaning, Plaintiff must show that "a substantial portion of the consuming public"—upon seeing Plaintiff's marks in connection with internet or intranet products or services—would associate those marks with Plaintiff. *Id.* Plaintiff's burden is heavy, as "[p]roof of secondary meaning entails vigorous evidentiary requirements." *Id.*

When a plaintiff attempts to show secondary meaning circumstantially through use of the mark (as opposed to directly through survey evidence), the First Circuit has instructed courts to analyze that evidence using the following three factors:

> (1) the length and manner of [a mark's] use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.

*Id.* at 182.

Plaintiff provides circumstantial evidence showing that it used its marks to: (1) make promotional presentations to five companies; (2) distribute "test copies" of its product to three companies; (3) provide free consulting services to one company; (4) make an official public announcement of its new intranet retrieval product on September 24, 1998; and (5) participate in the Internet World Fall '98 Conference (October 5–10, 1998), where Plaintiff displayed banners showing its marks and paraded around the conference eight Labrador retrievers dressed in clothes bearing Plaintiff's marks. In addition, Plaintiff received media coverage for its new product from four internet/computer publications (articles dated September 24, October 5, October 12, and October 26, 1998).[4]

■ Plaintiff's actions did not give its marks secondary meaning. All of Plaintiff's uses of its mark save one (the presentations to five companies) occurred only a few months before Defendant's first promotional use of the black Labrador. Had Plaintiff used its marks extensively in that brief period, the marks could have acquired secondary meaning. Plaintiff only used its marks, however, to mount a limited promotional campaign for its yet-to-be-released product. Such use is insufficient to establish secondary meaning. *Compare Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 816 (1st Cir.1987) (stating that (1) "[w]ords which have a primary meaning of their own ... may by *long* use in connection with a particular product, come to be known by the public as specifically designating the product;" and (2) secondary meaning "can be developed as a result of *extensive* advertising of a product with the mark") (emphasis added).

That several other internet-related companies used marks similar or identical to Plaintiff's marks[5] further indicates that Plaintiff's limited use did not give the marks secondary meaning. *See, e.g., Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1269 (7th Cir.1989) ("[T]hird party use of a substantially similar mark to promote the same goods or services to the same consumer class weighs against a finding that the consumer class associates the mark with one source."); MCCARTHY ON TRADEMARKS § 15:27 ("Widespread use [of marks] by third parties is ... evidence in support of a lack of secondary meaning.").

Because Plaintiff cannot show secondary meaning, its marks are not entitled to trademark protection. *See, e.g., Boston Beer,* 9 F.3d at 180. Plaintiff therefore has no likelihood of success on the merits.

### III.  Conclusion

For the aforementioned reasons, Plaintiff's motion for a preliminary injunction is DENIED.

---

4. Plaintiff claims to have used the marks to promote its products to 125 potential customer companies. As Plaintiff fails to provide evidence of how or to what extent it so used its marks, however, the court discounts that assertion. Likewise, Plaintiff's reference to media coverage from a segment of CNN's "Business Unusual" program is unhelpful, as Plaintiff does not provide evidence that its marks were at all used during the segment.

5. *See supra* note 2 and accompanying text.