TEC ENGINEERING CORP., Plaintiff,

v.

BUDGET MOLDERS SUPPLY, INC.
and Plastic Process Equipment,
Inc., Defendants.

Civil Action No. 95–40131–NMG.

United States District Court,
D. Massachusetts.

June 12, 1996.

James C. Donnelly, Jr., Charles B. Straus, III, Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, for TEC Engineering Corp.

Louis M. Ciavarra, Bowditch & Dewey, Worcester, MA, for Budget Molders Supply, Inc., and Plastic Process Equipment, Inc.

## MEMORANDUM AND ORDER

GORTON, District Judge.

On July 12, 1995, plaintiff, TEC Engineering Corp. ("TEC") filed a Complaint against defendants, Budget Molders Supply, Inc. ("Budget") and Plastics Process Equipment, Inc. ("PPE"), alleging trademark infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[1] Plaintiff and defendants manufacture conveyors that generally are used to transport lightweight plastic products from molding machines to other machines for packaging.

In addition to its Complaint, plaintiff filed, pursuant to Fed.R.Civ.P. 65, a motion for a preliminary injunction seeking to enjoin Budget from manufacturing, distributing, marketing, promoting, advertising, and/or selling its "Supraline" model, which closely resembles plaintiff's own "Ultraline" conveyor series. For the reasons that follow, this Court concludes that injunctive relief is appropriate and will be granted.

### I. Findings of Fact

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact:

1. TEC is a Massachusetts corporation that manufactures and distributes the "Ultraline" conveyor series, a system used primarily in the plastics processing industry. The Ultraline series includes horizontal, inclined and variable-inclined models of conveyors. TEC authorizes one of its independent distributors, Injection Molders Supply, Inc. ("IMS"), to advertise, promote, and sell Ultraline systems through its own private-label catalogues and brochures distributed throughout the industry, both in the United States and abroad. The Ultraline conveyors distributed by IMS are manufactured by TEC and are the same conveyors sold by TEC's own sales force.

2. IMS uses TEC's "Ultraline" trade name to identify the product, such that the same trade name is used by both TEC and IMS for promotional, advertising and product designation purposes. In its promotional

---

1. Defendants are both Ohio corporations with principal places of business located at the same address in Macedonia, Ohio.

materials, IMS identifies TEC as the manufacturer of the conveyor. For example, in a newsletter published by IMS in 1993 and 1994, IMS identified TEC as the manufacturer and designer of the Ultraline conveyors as follows:

> After testing the conveyors, and checking the workmanship and materials, IMS decided to have their conveyors built by TEC Engineering. IMS says molders will find their TEC-built conveyor the best value on the market, offering exceptional quality at a very reasonable price.

Fourth Affidavit of Maurice Minardi ("Fourth Minardi Aff.") at ¶¶ 4, 5, Exhibits U, V to Appendix of Exhibits Offered by TEC (hereinafter "App.Ex.").

3. TEC spends approximately $350,000 annually to advertise and promote Ultraline conveyors in the United States and in other countries. First Minardi Aff. at ¶ 5, Fourth Minardi Aff. at ¶ 6. Included among TEC's advertising and promotional activities are:

a) an industry-wide network of independent sales representatives who personally market Ultraline conveyors throughout the country;

b) regular advertising in industry publications; and

c) regular participation in national and international plastics industry trade shows.

Sales of Ultraline conveyors exceed 2,000 units per year, generating annual revenues of nearly $3,000,000. First Minardi Aff. at ¶¶ 4, 6.

4. As a result of TEC's sales, advertising and promotional activities, the image, appearance and overall design features of Ultraline conveyors have attained a degree of distinctiveness that is recognized in the plastics processing industry. *See* Affidavit of Michael Mohrbacher at ¶ 2; Affidavit of John R. Bell at ¶¶ 3, 7. The appearance and trade dress of Ultraline conveyors is readily distinguishable from those of other manufacturers, including certain conveyors manufactured by defendants. *See* App.Ex. O (catalogue of certain PPE conveyors); App.Ex. Q; First Kuchar Aff., Exhibit A.

5. Budget has competed with TEC and other conveyor manufacturers in the plastics processing industry market for more than five years. Budget markets its conveyors exclusively through direct catalogue sales.

6. In early, 1995, Budget modified the design of its primary line of conveyors and sold its first "Supraline" conveyor in June 1995. Third Kuchar Aff. at ¶ 3; First Kuchar Aff. at ¶ 6. Defendants' Supraline bears a striking resemblance to the Ultraline conveyor in virtually every respect, including, *inter alia:*

a) overall size, shape and dimensions;

b) green color of the conveyor belt;

c) the bronze color and shade of the anodized finish of the machines' aluminum frames;

d) the locations of the brand labels and the product serial number plate;

e) the configuration of the aluminum extrusions used in the conveyors' frames, including decorative grooves (referred to by the parties as "scribe lines");

f) the design, color and configuration of the joint used to adjust the variable incline of the conveyor;

g) the number, location and appearance of bolts and fasteners visible from the outside of the machine;

h) the number, location, color and appearance of the locking devices used to adjust the incline;

i) the design, color and appearance of the "end caps;" and

j) the design, color and appearance of the anodized aluminum side rails.

Second Minardi Aff. at ¶ 4. At both hearings held in conjunction with the motion for injunctive relief, this Court was able to observe the remarkable similarity between the Ultraline and Supraline conveyors by means of a side-by-side comparison of the machines.

7. The Budget catalogue includes pictures of Supraline conveyors which are identical in appearance to TEC's Ultraline conveyors. *Compare* App.Ex. N with App.Ex. A. Although Budget labels each Supraline conveyor with a sticker that reads "Budget Molders Supply, Inc.," and its advertisements feature the company name and place of origin, the

labels cannot be seen in the advertisement photographs of the Supraline. Moreover, the Budget catalogue's description of features of the Supraline is nearly identical to that found in TEC's description of the Ultraline. *Compare* App.Ex. A at p. 4 with App.Ex. N at p. 2.

8. In late May, 1995, John R. Bell ("Bell"), an independent TEC sales representative, called TEC to complain that he had received an advertising postcard from Budget soliciting the sale of what he believed were TEC-manufactured Ultraline ·conveyors. Bell Aff. at ¶ 4; First Minardi Aff. at ¶ 8; App.Ex. K. Based upon the picture on the post card, Bell, a person familiar with the plastics industry, had concluded that TEC was selling Ultraline conveyors through Budget and was thereby undercutting its own sales force. Bell Aff. at ¶¶ 3–5.

9. In late May or early June, 1995, TEC's National Sales Manager, Andrew H. Redgate ("Redgate"), met with Michael Mohrbacher ("Mohrbacher"), a plant advisor to E–S Plastics in Waterford, Wisconsin. Like Bell, Mohrbacher is experienced in the plastics processing industry and familiar with the "distinctive appearance" of TEC's Ultraline conveyor. Mohrbacher Aff. at ¶ 2. Based upon a catalogue advertisement that he had received from Budget advertising the Supraline conveyor, Mohrbacher concluded that TEC was distributing its Ultraline conveyor through the Budget catalogue and asked Redgate why TEC had begun selling the Ultraline through another company at a lower price. *Id.* at ¶ 3; Redgate Aff. at ¶ 2. Seeing a Budget sales catalogue in Mohrbacher's office, Redgate asked if that was where he saw the suspect advertisement; Mohrbacher responded, "Yes, that's the one." Redgate Aff. at ¶ 2.

10. As discussed in more detail in Part II below, some of the similarities between the Ultraline and Supraline are, to some extent, functional. Both parties have submitted advertisements for conveyors manufactured by other companies which share some of the

similarities of the conveyors at issue, but the degree of similarity between those other machines and the Ultraline fall far short of the similarities between the TEC machine and the Supraline.[2] *See* App.Ex. Q; Second Kuchar Aff., Ex. A; Fourth Kuchar Aff., Ex. A. Moreover, Budget's own sister company, PPE, has issued a catalogue of PPE conveyors that are not marketed under the Supraline name and are .readily distinguishable from the TEC Ultraline conveyors. *See* App. Ex. O.

11. At the hearing held in connection with the motion, the Court and counsel for TEC reviewed photographs of a modified Budget conveyor which appears, to this Court, to have avoided the infringement of the Ultraline trade dress. The specific changes to the Budget conveyor, enumerated in the fourth affidavit filed by defendants' president, include: 1) changing the color of the machine "from bronze to clear," 2) eliminating the decorative scribe lines, 3) changing the shape of the end caps by squaring them off, 4) relocating the machine's on/off switch, 5) redesigning of the conveyor's stand, 6) reshaping the hopper at the bottom of the incline model, and 7) abandoning the use of the name "Supraline." Fourth Kuchar Aff. at ¶ 4. In addition, Budget proposes not to advertise or promote the machines with a green belt, although it would sell the machines with a green belt if specifically requested to do so by a customer.

## II. *Conclusions of Law*

■ In ruling on the motion for a preliminary injunction, this Court must consider whether TEC has established that: 1) it has a substantial likelihood of success on the merits, 2) there exists, absent injunctive relief, a significant risk of irreparable harm, 3) the balance of hardship tilts in its favor, and 4) granting the injunction will not negatively affect the public interest. *TEC Engineering Corp. v. Budget Molders Supply Inc.,* 82 F.3d 542, 544 (1st Cir.1996). Those considerations are discussed *seriatim.*

---

**2.** It should be noted that the use of suffix "line" in the model name of conveyors appears to be prevalent in the plastics processing industry. In addition to "Ultraline" and "Supraline," other model names include "A-line," "Flex-line," "Slim-line," "Omni-line," and "Direct-line." Second Kuchar Aff. at ¶ 4.

### A. *Likelihood of Success on the Merits*

TEC alleges that defendants have impermissibly copied the trade dress of its Ultraline conveyor, in violation of section 43(a) of the Lanham Act. The "trade dress" of a product "is essentially its total image and overall appearance." *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir.1989). An item's trade dress entails the total image of the product and "may include features such as size, shape, color, or color combination, texture, graphics, or even particular sales techniques." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983).

To establish a violation of the Lanham Act, TEC must prove that:

1) the design of the Ultraline conveyor is inherently distinctive or has acquired a secondary meaning, and

2) there is a likelihood that prospective purchasers of conveyors will be confused as to the source of the Budget conveyor.

*See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992). A third factor which must be considered in determining whether there is a likelihood of success on the merits of TEC's claim is the functionality of the design allegedly copied. *Id., TEC Engineering, Corp.*, 82 F.3d at 546 n. 3.

### 1. *Functionality*

To be protected under the Lanham Act, trade dress must be non-functional. *Two Pesos, Inc.*, 505 U.S. at 769, 112 S.Ct. at 2757–58. A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). A feature is non-functional if it is merely an "arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality, and, hence, unrelated to basic consumer demands in connection with the product...." *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

At both hearings held in conjunction with TEC's motion for a preliminary injunction, plaintiff pointed to several features that it contends are non-functional, yet were "slavishly copied" by defendants on the Supraline, including: 1) a green conveyor belt, 2) decorative scribe lines, 3) the bronze color of the aluminum finish, 4) the location of switches, 5) the assembly of the conveyor's base and support legs (and the casters on the vertical legs), 6) the shape of the aluminum catch bin, 7) the shape and color of the lock knobs to adjust the conveyor's height, and 8) the color and appearance of the end caps. When one adds to the foregoing list the similarity between the names "Ultraline" and "Supraline," TEC argues persuasively that consumers would naturally conclude that there is a relationship between the products.

While acknowledging that many of the items enumerated above are non-functional, Budget submits that the green color of the conveyor belt serves a functional purpose. Specifically, Budget's president declares in an affidavit that he has learned that the green belt is able to transport products at a warmer temperature than non-green belts. *See* Third Kuchar Aff. at ¶ 7. Kuchar's assertion is effectively rebutted, however, by the affidavit of a third-party witness, Patric Crumley ("Crumley"), the Vice–President of Sales & Marketing for Sparks Belting Company. Specifically, Crumley states that a variety of belt colors are available for conveyors because the belt's color has "very little or nothing to do" with its temperature rating. Crumley Aff. at ¶ 3. Similarly, the anodized aluminum parts of the conveyors are available in a variety of colors and textures. *See* Third Minardi Aff. at ¶ 3; App. Ex. S (listing range of available colors). In sum, this Court concludes that the features which TEC contends distinguish the Ultraline conveyors from conveyors other than the Supraline model are not essential for the machines' efficient operation and are, therefore, non-functional.

### 2. *Secondary meaning*

Secondary meaning is established where the plaintiff shows that a "significant

quantity of the consuming public understand [the trade dress of a product] as referring exclusively" to the plaintiff. *President & Trustees of Colby College v. Colby College–New Hampshire*, 508 F.2d 804, 807 (1st Cir. 1975). Among the factors which demonstrate secondary meaning are: 1) long and exclusive use, 2) evidence of extensive advertisement and promotion of a product, and 3) evidence of successful sales of the product. *See id.* at 807–08. Additional support for a finding of secondary meaning may be found when there is evidence that the trade dress of a product has been copied down to the smallest detail. *See Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F.Supp. 952, 958 (E.D.N.Y.1992).

■ In the case at bar, this Court concludes that, based upon the evidence presented, TEC is likely to succeed in demonstrating that the overall design of its Ultraline conveyor has achieved secondary meaning in the plastics processing industry. TEC has expended substantial resources in promoting its Ultraline machines by advertising in industry publications and participating in plastics industry trade shows around the world. In addition, Ultraline sales have been extensive: more than 2,000 units were sold in 1994, generating revenues of approximately $3,000,000 that year and giving TEC a substantial share of the industry-wide market. Moreover, persons experienced in the plastics processing industry are familiar with the "distinctive appearance" of TEC's Ultraline conveyor. *See* Mohrbacher Aff. at ¶ 2.

■ Defendants have advanced the argument that the Ultraline's secondary meaning has been diluted by the fact that IMS also sells the Ultraline conveyors. This Court disagrees. IMS' promotional efforts, including its authorized use of TEC's "Ultraline" name, do not obscure the origin or sponsorship of the product. To the contrary, the promotional materials, which prominently identify TEC as the manufacturer and endorse the Ultraline, serve to reinforce the secondary meaning. In sum, as the Court in *Essie Cosmetics, Ltd.* observed:

> [w]here the overwhelming amount of sales are made under the main label and the plaintiff is not competing so adversely with

its own product under different trade names as to dilute the inference of its origin, secondary meaning is retained and there is no loss of Lanham Act protection.

808 F.Supp. at 959.

### 3. *Likelihood of confusion*

■ Likelihood of confusion has been described as "the key element in any infringement action." *Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 559 (1st Cir.1982). In assessing the likelihood of confusion, the First Circuit considers the following eight factors:

1) the similarity of the marks;

2) the similarity of the goods;

3) the relationship between the parties' channels of trade;

4) the relationship between the parties' advertising;

5) the classes of prospective purchasers;

6) evidence of actual confusion;

7) the defendant's intent in adopting the mark; and

8) the strength of a plaintiff's mark.

*Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 (1st Cir.1989). Moreover, evidence of actual confusion is "highly persuasive" in proving the existence of the likelihood of confusion. *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.Supp. 994, 1011 (D.Mass.1988).

■ In the case at bar, there is evidence of actual confusion in the minds of persons familiar with the plastics processing industry with respect to the source and/or sponsorship of the Supraline conveyor. *See* Bell Affidavit at ¶¶ 3–5. Upon receiving the Budget catalogue, Mr. Mohrbacher, a knowledgeable buyer in the industry who was familiar with the Ultraline's "distinctive appearance," concluded that TEC was distributing its Ultraline conveyor through Budget. Mohrbacher Aff. at ¶ 3; Redgate Aff. at ¶ 2. In view of: 1) the striking physical similarity between the conveyors, 2) the somewhat limited class of prospective consumers of the machines, and 3) the evidence of actual confusion in the record, this Court concludes that TEC has satisfied its burden of demonstrating a likeli-

hood of confusion as to source or sponsorship of the Supraline conveyor.

### B. *Irreparable harm*

 In the First Circuit, "irreparable harm may be shown even in the absence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits of its claim of trademark infringement." *Calamari Fisheries, Inc.*, 698 F.Supp. at 1013. This is so because "[t]he public interest purposes of the Lanham Act ... require[ ] a liberal interpretation of the irreparable injury factor." *Camel Hair & Cashmere Inst. of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14 (1st Cir.1986). Indeed, not only is proving the loss of sales as a result of infringement "notoriously difficult," see *Calamari Fisheries, Inc.*, 698 F.Supp. at 1013 (quoting *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971)), but the likelihood that consumers will be confused as to a product's source or sponsorship provides a "potent basis for a finding of irremediable injury." *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 699–700 (1st Cir.1987).

 In the instant action, this Court concludes that the likelihood that customers will be confused as to the source of the Supraline provides a "potent basis" for a finding of irremediable injury. *See Hypertherm, Inc.*, 832 F.2d at 700. In so ruling, this Court is cognizant of the First Circuit's observation that:

> Few harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it. The threat to [plaintiff's] hard-won business and reputation made out a showing of irreparable harm to warrant immediate redress.

*Id.*

### C. *Balancing of harms*

 In considering this factor, it must be borne in mind that, where the likelihood of plaintiff's success on the merits is great, "the less weight is to be given to the defendant's loss." *FDIC v. Elio*, 39 F.3d 1239, 1248 (1st Cir.1994) (internal quotation omitted). The harm to plaintiff has been discussed, *supra.*

 Defendants argue that the harms they have suffered and will continue to suffer if injunctive relief is reaffirmed include, *inter alia,* 1) continuing damage to their business reputation, 2) advertising expenditures for the Supraline which will have been wasted, and 3) parts and equipment worth approximately $150,000 which Budget will be unable to use. *See* Fourth Kuchar Aff. at ¶ 2.

This Court understands that a continuation of the injunction will cause Budget to suffer hardship, yet concludes that, given TEC's showing of likelihood of success on the merits, such hardship is insufficient to tip the scales on the issue of harm in their favor. Because TEC has shown such a likelihood of success, the defendants' chances of suffering any legally-compensable harm are conversely reduced. *See Dion v. Heckler*, 582 F.Supp. 872, 875 (D.Mass.1984).

### D. *Public interest*

 There is no need to dwell upon the factor of public interest. The relevant consideration in this case is "the consumers' interest in not being deceived or confused about the products they purchase." *See Calamari Fisheries, Inc.*, 698 F.Supp. at 1015. The prevention of consumer confusion clearly serves the public interest, and this Court concludes that issuance of an injunction will further the important purposes of the Lanham Act.

### ORDER

For the foregoing reasons, and until further order of the Court, the defendants, their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, are hereby restrained and enjoined from manufacturing, distributing, promoting, advertising and/or selling:

(1) the horizontal, inclined and variable inclined Budget Supraline conveyors; and

(2) any other conveyor which:

 (a) is advertised and/or promoted with a green conveyor belt,

(b) includes any of the following features:

(i) a bronze anodized finish,

(ii) aluminum extrusions with decorative scribe lines,

(iii) black end caps substantially identical to those used on the TEC Ultraline conveyor,

(iv) an overall machine configuration that is substantially identical to that depicted in current advertising for the TEC Ultraline conveyor, and

(c) is marketed under the name "Supraline."

Furthermore, the defendants, their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them are hereby restrained and enjoined from producing or distributing any advertising or promotional materials which depict the Supraline conveyor or any other product which violates the provision of subparagraph (2) above.

Pursuant to Fed.R.Civ.P. 65(c), this Court further orders plaintiff to increase the bond already posted by an additional Fifty Thousand Dollars ($50,000), as additional security for this preliminary injunction.

So ordered.