**CENTRAL TOOLS, INC., Plaintiff,**

v.

**PRODUCTS ENGINEERING CORP.
and Fred V. Fowler Co., Inc.,
Defendants.**

Civ. A. No. 94–0377–L.

United States District Court,
D. Rhode Island.

Aug. 21, 1996.

Leonard Michaelson, Elliot A. Salter, Salter, Michaelson & Benson, Providence, RI, Howard N. Aronson, James E. Siegel, Robert M. Golden, Lackenbach, Siegel, Marezullo, Aronson & Greenspan, Scarsdale, NY, for plaintiff.

Karen Ann Pelczarski, Blish & Cavanagh, Providence, RI, Ann F. Vinci, Bower & Gardner, New York City, Lori J. Polacheck, Charles R. Parrott, Nutter, McClennen & Fish, Boston, MA, for defendants.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

Good things may come in small blue boxes, but whence they come is the question. This matter is before the Court on cross motions for summary judgment pursuant to Fed. R.Civ.P. 56 and Local Rule 12.1. Plaintiff Central Tools, Inc. ("Central Tools") alleges that the defendants, Products Engineering Corp. ("Products Engineering") and Fred V. Fowler Co., Inc. ("Fowler"), infringed on its trade dress in violation of § 43(a) of the Lanham Act, as amended, 15 U.S.C. § 1125(a) (1996), and New York state law. Central Tools also brings a claim—belatedly withdrawn—alleging conspiracy in restraint of trade, in violation of § 1 of the Sherman Act, as amended, 15 U.S.C. § 1 (1990). Products Engineering and Fowler respond that Central Tools' trade dress does not merit protection under the Lanham Act, and even if it does, Central Tools has failed to show sufficient likelihood of confusion to impose liability on the defendants. In addition, the defendants move to strike portions of the affidavits and materials that Central Tools has submitted to the Court in support of its cross motion.

For the following reasons, the Court grants defendants' motion for summary judgment and denies plaintiff's cross motion. For additional reasons explained below, the Court does not reach the motion to strike.

## I. Background Facts

The sales area contested by Central Tools, Products Engineering, and Fowler is the automotive aftermarket—those who service and repair cars. Central Tools, a Rhode Island company, makes and distributes a broad array of precision measuring tools that are specifically designed to test and gauge automotive parts. The thrust of Central Tools' sales and marketing efforts is towards the automotive industry; the firm sells its products to catalog houses, retail outlets, and other distributors.

Defendant Products Engineering, a California corporation, builds an abundance of gages and instruments and then sells them to distributors in many different markets. Fowler, a Massachusetts-based distributor, buys its wares from Products Engineering, labels them with the Fowler name, and sells to other distributors, who then sell to end-users and tertiary distributors in the automotive or industrial fields. (Some of Fowler's customers sell to both.) Historically, the principal difference between Fowler and Central Tools has been Fowler's willingness to service many industries, while Central Tools has hewn to cars.

The trade dress that Central Tools seeks to defend cloaks a family of instruments known generically as dial indicator sets, which Central Tools, Products Engineering, and Fowler make and/or distribute. A dial indicator set comprises a measuring tool in the form of a dial, with gradations around the edges and a needle to indicate the reading, and a collection of attachments used to mount the dial on a stable surface (in this case, a car part). There is nothing distinctive or original about a dial indicator set *per se;* the parties concede that dial indicators are a common product, with uses that extend far beyond the automotive realm.

However, Central Tools contends that the way it packages and presents its dial indicator sets is sufficiently distinctive to serve as a beacon of the sets' origin. Starting in the early 1980s, Central Tools began to box its dial indicator sets in a uniform, consistent manner. Its first effort in that direction had come in 1972, when it began using a red, plastic-covered trapezoidal magnet as a base

for some of its dial indicators. Nevertheless, throughout the 1970s, Central Tools packaged its products in cardboard boxes, red "jewelers" boxes, and in black plastic cases, without rhyme or reason. Then, in 1982 or 1983, Central Tools began to sell its dial indicator sets in blue, blow-molded plastic cases with black latches and specially molded interiors. Central Tools describes its trade dress as follows:

8. This packaging consists of a blow-molded, textured **blue** plastic case, with a **black** buckle-shaped latch. The case is specifically designed to hold the Dial Indicator Set components in form fitted slots.

9. For CENTRAL Model Nos. 6405, 6406, 6407, 6410 and 6411, all of which are Dial Indicator Sets with magnetic bases, CENTRAL uses **red** plastic to encase the magnetic base.

10. For CENTRAL Model Nos. 6450, 6451, 6454, and 6455, all of which are Dial Indicator Sets with Flex–Arms, the Flex–Arm locking lever is protected by a **red** plastic cover and the mounting block on the locking pliers is **black.**

11. The colors **blue** for the Dial Indicator Set form-fitted cases, **black** for the buckle-shaped latch and the Flex–Arm mounting block, and **red** for the magnetic base covers and Flex–Arm locking lever covers were chosen arbitrarily, to distinguish CENTRAL's product from its competitors. These colors are not functional in any way.

Complaint at 2–3 (emphasis in original).

The blue plastic cases used by Central are flat and hinged on the side opposite the black latch. Inside, the components of the dial indicator set lie snugly in the form-fitted slots; the slots cushion and hold the parts during shipment. Declaration of Alec B. Dawson, Exh. 7. In addition, an empty slot reminds the purchaser that part of the set has gone astray. On certain models, the red plastic cover on the trapezoidal magnet protects it and prevents it from being attracted to the other metal parts.

The language of Central Tools' Complaint masks the fact that, disassembled, the components of the dial indicator sets can hardly be called distinctive. Hundreds of companies

in the tool industry sell their products in hard plastic cases, many with the same black latches. Affidavit of Michael Mulholland at 2. (The configuration of the form-fitted interiors, however, is specific to Central Tools.) On model 6450, the disc-rotor/ball-joint gage, the "locking pliers" are actually trademarked Vise Grip pliers; the Flex–Arm is made by Flexbar Machine Corp., which *only* uses red plastic on its locking levers. Declaration of Alec B. Dawson, Exh. 5; Affidavit of Fred V. Fowler at ¶ 26.

In addition to its trade dress, Central Tools uses its trademarked logo "extensively" on its dial indicator sets, to tell consumers that they are, indeed, purchasing a Central Tools product. Deposition of Alec B. Dawson (10/26/94) at 42. The sets are shipped with a white cardboard cover that has a Central Tools sticker on it. Deposition of Alec B. Dawson (11/28/94) at 121–122. Another label, with the Central Tools logo, goes directly on the plastic case. *Id.* at 117–118. And inside, the logo is stamped on the face of the dial, Declaration of Alec B. Dawson, Exh. 7, the one place the purchaser is guaranteed to look.

During the 1980s, Central Tools was the dominant manufacturer and distributor in the automotive aftermarket. The company states that, as of 1987, it controlled 80 percent of the market, and Fowler had 3 percent. Deposition of Alec B. Dawson (11/30/94) at 156. By 1992, after Fowler's increased efforts in the market, Central Tools' share had slipped to "a little bigger than" 53 percent, perhaps "as much as 70 percent," and Fowler's share had risen to "[b]etween 15 and 20" percent. *Id.* During this period, dial indicator sets represented "between 40 and 50 percent" of Central Tools' sales. *Id.* at 157.

Defendants and Central Tools contest the date on which Fowler began using blue, blow-molded plastic packaging for its own dial indicator sets. Fowler argues that it was the first to use blue, blow-molded packaging, while Central maintains that Fowler's

trade dress did not mimic its own until the late 1980s. It is clear that since 1958, blue has been the Fowler company color; for twenty-five years, most Fowler products have traveled in some form of blue box—be it cardboard, a plastic sleeve, or a carrying case. As for dial indicator sets, Fowler presents evidence that, since the 1960s, it has distributed a set made by Verdict Gage which is packaged in a blue, blow-molded box with a black foam liner. Affidavit of Fred V. Fowler, Exh. C. In the late 1970s, Fowler began selling a set manufactured by Chicago Dial Indicator ("CDI"). The CDI set comprises a black-rimmed dial with black attachments and C-clamp, nestled in a blue, blow-molded plastic case with a black latch. Affidavit of Fred V. Fowler, Exh. D. According to Fowler, its purveyance of the CDI set makes it the senior user of Central Tools' claimed trade dress and Central Tools the junior.

Enter Snap-on Tools ("Snap-on"), one of the country's largest distributors of tools for the automotive repair business.[1] Until approximately 1988, Snap-on bought most of its dial indicator sets, which bore the Snap-on brand, from Central Tools. At that point, Snap-on asked Fowler to become its new supplier, specifying that the dial indicator sets had to bear the Snap-on name, be packaged in red, blow-molded plastic cases, and, if the set included a magnet, the magnet had to be covered in red plastic. Affidavit of Fred V. Fowler at ¶¶ 20–22 & Exh. E. Fowler agreed, and did two things: First, it arranged for Products Engineering to manufacture the red Snap-on sets, and second, it asked Products Engineering to build similar sets for Fowler to sell to its other customers. Affidavit of Fred V. Fowler at ¶ 23.

Central Tools' claims against Products Engineering and Fowler arise out of these second sets, which are cognates—near twins—of Central Tools' own sets. Fowler instructed Products Engineering to package the cognate sets in blue, blow-molded plastic cases; to save money, the magnets would be cov-

---

1. Fowler maintains that throughout the 1980s, Snap-on distributed Fowler's dial indicator sets in blue, blow-molded plastic cases. Affidavit of Fred V. Fowler at ¶ 20. However, Fowler concedes that the only Fowler product featured by Snap-on in its catalogs was a set packaged in a wooden box, *id.*, and the Court has no idea what the other sets might have looked like.

ered in the same Snap-on red plastic that Products Engineering was already using. Affidavit of Fred V. Fowler at ¶ 24. Products Engineering and Fowler began production of the Snap-on dial indicator sets, and their blue-packaged cousins, in 1988 or 1989. Defendants have continued to manufacture and distribute the sets to this day.

Central Tools has put forth evidence suggesting that, when Products Engineering set out to design the cognate sets, it copied Central Tools' products. For example, Products Engineering printed an instructional pamphlet for its 1″ range dial indicator set that clearly borrows from a pamphlet Central Tools wrote for its model 6410 set. Declaration of Alec B. Dawson, Exh. 12 & 13. Both contain the same typographical error ("value guide wear" instead of "valve guide wear") and apply five identical part numbers to component elements of the set. *Id.*

Products Engineering and Fowler do not question the similarities between the instructional pamphlets, but counter with evidence that purchasers of Fowler dial indicator sets are not likely to be confused as to their origin. First, defendants point out that, of the nine models listed in the Complaint, Products Engineering and Fowler make and sell cognates of only three—models 6405, 6410, and 6450. Mem. in Support of Defs. Motion for Summary Judgment at 6 n. 5. Central Tools offers nothing in rebuttal. Second, each Fowler set bears a large, noticeable Fowler logo on the top of its blue plastic case; the Fowler name is also printed on the face of the dial. Affidavit of Fred V. Fowler at ¶¶ 17, 27 & Exh. G.

On February 28, 1994, Central Tools brought suit against Products Engineering and Fowler in the United States District Court for the Eastern District of New York. Count I of the Complaint alleged that the defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by infringing on Central Tools' trade dress and creating a false designation of origin. Count II asserted that the defendants' actions, by depriving Central Tools of sales, injuring its reputation, and passing off their dial indicator sets as Central Tools', violated the plaintiff's rights "under the common law and statutory law of the State of New York." Count III sought injunctive relief under N.Y.Gen.Bus.Law § 368–d; Count IV prayed for injunctive relief under N.Y.Gen.Bus.Law § 349, on the grounds that the "[d]efendants are engaging in deceptive trade practices or acts[.]" Count V set forth a now-abandoned claim under § 1 of the Sherman Act, 15 U.S.C. § 1. On July 18, 1994, the case was transferred to this Court. Eleven months later, on June 12, 1995, Products Engineering and Fowler moved for summary judgment on all claims; Central Tools filed its cross motion on June 23, 1995.

While the parties in this matter leave no rock unthrown, the cross-motions before the Court can be reduced to three issues. First, Product Engineering and Fowler question the scope and definition of Central Tools' trade dress. Specifically, defendants contend that Central Tools should not be allowed to include Central model number 6462, a cylinder bore gage, in the group of instruments covered by the Complaint. Model 6462 is an instrument that is lowered into a piston cylinder to check for wear—it has an oddly shaped foot with contact extensions, a black eight inch body, and a small dial for a head. Declaration of Alec B. Dawson, Exh. 5. It is packaged, like the dial indicator sets, in a blue, blow-molded plastic case. *Id.* at Exh. 10. Products Engineering and Fowler admit that they used a copy of the model 6462 when they manufactured their own cylinder bore gage, Deposition of Martin Luboviski (4/5/95) at 296–297, but argue that their version is sold in a blue cardboard box with a black foam insert. Declaration of Alec B. Dawson, Exh. 23 (photograph of defendants' cylinder bore gage). Therefore, there is no issue of trade dress infringement posed by model 6462, and it must be excluded from this matter.

Central Tools, in turn, argues that its trade dress extends to the shape of model 6462. In 1994, Central Tools applied to register its cylinder bore gage (and the red trapezoidal base used in its dial indicator sets) with the United States Patent and Trademark Office ("USPTO"). Declaration of Alec B. Dawson, Exh. 17 & 18. It has submitted materials from that office, and evi-

dence that distributors mistakenly returned cylinder bore gages made by defendants to Central Tools, as part of the documentary materials underpinning its cross motion.

The second and third issues raised in this matter are far more pedestrian: whether Central Tools' trade dress merits protection under the Lanham Act, and, if so, whether Central Tools has demonstrated a sufficient likelihood of confusion to impose liability on defendants.

Not content to let the motion for summary judgment run its course, on August 9, 1995, Products Engineering and Central Tools filed a motion to strike portions of the Declaration of Alec B. Dawson that concerned, among other things, the model 6462 cylinder bore gage and the USPTO proceedings. Defendants also move to strike specific paragraphs of the Declaration of Jack Manalli and the Declaration of William E. Green, III—both of whom have eerily identical statements to offer. Declaration of Robert B. Golden, Exh. 9 & 10 (presenting the Manalli and Green declarations as attachments).

After hearing oral argument on the cross motions for summary judgment and the motion to strike, the Court took this matter under advisement. The motions are now in order for decision.

## II. Standard for Decision

■ Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on motions for summary judgment:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to a judgment as a matter of law.

The Court will view all facts and related inferences in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Thus, where there are cross motions, "each party's motion for summary judgment must be addressed by examining the facts and inferences in favor of the other party." *Berger v. R.I. Bd. of Governors for Higher Educ.*, 832 F.Supp. 515, 517 (D.R.I.1993).

## III. Analysis

### A. Count I: The Lanham Act Claim

*1. The Lanham Act*

Congress passed the Lanham Act in order to make "actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair competition[.]" 15 U.S.C. § 1127 (1996). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), addresses the evil of misappropriation of trade dress, the age-old ruse by which one merchant passes off his wares as those of another, tricking the latter's customers into buying from him.[2] For Central Tools' trade dress to be protected by § 43(a), it must be "distinctive"—it must "identify and distinguish [the company's] goods ... from those manufactured or sold by others and ... indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (1996). Furthermore, the question of distinctiveness is but the first element of Lanham Act analysis. In *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), the Supreme Court stated:

The general rule regarding distinctiveness is clear: an identifying mark is distinctive

---

2. Section 43(a) states in relevant part:

**False designations of origin, false descriptions, and dilution forbidden**

**(a) Civil action; any person**

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... which—

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[,]

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1)(A) (1996).

and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning. It is also clear that eligibility for protection under § 43(a) depends on non-functionality. It is, of course, also undisputed that liability under § 43(a) requires proof of the likelihood of confusion.

*Id.*, at 769, 112 S.Ct. at 2758 (citations omitted) (emphasis in original).

■ To establish a violation of the Lanham Act § 43(a), Central Tools must prove, first, that the trade dress of its dial indicator sets is either inherently distinctive or has acquired secondary meaning. Then, the Court will consider whether Central Tools' trade dress is non-functional.[3] Last, Central Tools must prove that prospective consumers of its dial indicator sets are likely to be confused as to the origin of the Products Engineering and Fowler sets, believing them to be Central Tools' products.

*2. Scope and Definition of Central Tools' Trade Dress*

■ Central Tools' trade dress is the overall appearance and presentation of its dial indicator sets. "Trade dress is the totality of elements in which a product or service is packaged or presented. These elements combine to create the whole visual image presented to customers and are capable of acquiring exclusive legal rights as a type of identifying symbol of origin." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8.01[1][a] (3d ed. 1996); *see also L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1129 (Fed. Cir.), *cert. denied*, 510 U.S. 908, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) ("Trade dress is thus viewed as the overall combination and arrangement of design elements into the total image by which the product is perceived by the consuming public."). Such general statements, however, conceal the Court's

duty to define Central Tools' trade dress carefully, in order to avoid an overly broad application of the Lanham Act and the danger of uncertainty among Central Tools' present and future competitors. As one commentator has noted:

[I]t will not do to solely identify in litigation such a totality as "the trade dress." Rather, the discrete elements which make up that totality should be separated out and identified in a list. Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement.

1 *McCarthy on Trademarks* § 8.01[1][c].

■ Products Engineering and Fowler argue, correctly, that Central Tools has been chary about defining the exact scope of its trade dress, above and beyond the elements listed in the Complaint. In fact, Central Tools has designed its arguments to cast its trade dress over every dial indicator set it makes, including model 6462, the cylinder bore gage. Central Tools states that "[t]he size, shape, color and layout of the component pieces of the [dial indicator sets] also contribute to the overall impression" created by the color and type of packaging, Mem. in Support of Pl. Cross Motion for Summary Judgment at 9, which means that whatever Central Tools chooses to put in a blue plastic box becomes part of its trade dress.

The Court cannot, and will not, conduct its Lanham Act inquiry on the basis of speculative trade dress. The Court will limit itself to the trade dress, and model numbers, described in ¶¶ 8–11 of the Complaint. More specifically, the Court defines Central Tools' dial indicator trade dress as the overall impression created by the packaging and presentation of models 6405, 6410, and 6450. It is undisputed that defendants do not make cognates of the other six models. For mod-

---

3. Central Tools and defendants have argued strenuously over which party bears the burden of persuasion on the question of functionality—there is a circuit split on the issue. However, the First Circuit recently wrote: "We find it unnecessary to decide at this juncture whether functionality is an element of the plaintiff's claim or an affirmative defense to be raised by the defen-

dant. In either event, we think it is a factor that the district court should consider[.]" *TEC Engineering Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 546 n. 3 (1st Cir.1996) (citations omitted). Hence, the Court will consider the evidence put forth by both parties evenly, without either side bearing the burden, or enjoying the benefit, of any presumptions.

els 6405 and 6410, the elements of the trade dress are the blue blow-molded plastic case, the black latch, the form-fitted interior and layout, and the red plastic-covered trapezoidal magnet. For model 6450, the elements are the box, the latch, the molded interior, the red plastic cover on the Flex–Arm locking lever and the black mounting block on the Vise Grips.

Limiting the scope of Central Tools' trade dress in this manner permits swift resolution of a number of issues. First, the model 6462 cylinder bore gage is deemed outside the perimeters of this action.[4] All evidence submitted by Central Tools that pertains exclusively to model 6462 is disregarded—including evidence of copying and the USPTO file. In turn, the Court does not need to reach those elements of the defendants' motion to strike that concern the cylinder bore gage.

■ Second, by defining Central Tools' trade dress as the overall impression rendered by the specific grouping of elements constituting models 6405, 6410, and 6450, the Court can settle the disputed issue of first use. "The right to trademark and service mark rights is based on prior use, or the one who first uses the marks in connection with a peculiar line of business." *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815 (1st Cir.1987). Fowler has presented evidence that it has distributed the Verdict Gage in a blue-plastic box since the 1960s, and that it began distributing the CDI set in the 1970s. But the Verdict Gage and the CDI set are irrelevant to the question of when defendants' adopted Central Tools' trade dress with regards to models 6405, 6410, and 6450.[5] The Court need only consider when defendants began producing cognates of those three models. Central Tools' dial indicator sets slipped into their uniform packaging in 1982, at the earliest. Defendants began making and distributing their

model 6405, 6410, and 6450 cognates at the behest of Snap-on Tools in 1988. (Defendants' use of Central Tools' model 6410 instructional pamphlet is additional evidence of the order of use.) Therefore, giving all parties the benefit of the earliest dates, Central Tools was the first user of its trade dress, in 1982, and defendants followed six years later.[6]

### 3. The Distinctiveness and Functionality of Central Tools' Trade Dress

■ To be worthy of protection under § 43(a) of the Lanham Act, Central Tools' trade dress must be sufficiently distinctive to serve as an indicator of the product's origin. In *Boston Beer Co. v. Slesar Bros. Brewing Co. Inc.,* 9 F.3d 175 (1st Cir.1993), the First Circuit stated:

A court's inquiry into whether a term merits trademark protection starts with the classification of that term along the spectrum of "distinctiveness." At one end of the spectrum there are generic terms that have passed into common usage to identify a product, such as aspirin, and can never be protected. In the middle there are so-called descriptive terms, such as a geographical term, which can be protected, but only if it has acquired "secondary meaning" by which consumers associate it with a particular producer or source. At the other end of the spectrum, there are suggestive, arbitrary and fanciful terms that can be protected without proof of secondary meaning. These terms are considered "inherently distinctive."

*Id.* at 180 (citing *Two Pesos,* 505 U.S. at 767, 112 S.Ct. at 2756) (additional citations omitted).

■ The Court disagrees with Central Tools' contention that its trade dress is inherently distinctive, and thus automatically

---

4. The Court notes that, even if the model 6462 cylinder bore gage were to be included in the definition of Central Tools' trade dress, the defendants' 6462 clone is packaged in a blue cardboard box with a black foam insert. Without ruling on the matter, the Court opines that Central Tools would have a difficult time proving a violation of § 43(a) when the defendants' packaging is so demonstrably different.

5. As is any evidence Fowler might produce regarding Snap-on's earlier sale of Fowler sets in blue boxes.

6. The defendants also plead the affirmative defense of laches. As the Court does not find defendants liable in this matter, *see* part III.A.4.f, *infra,* consideration of affirmative defenses is unnecessary.

protectible. Courts have grappled with the issue of inherent distinctiveness by referring to the factors enumerated in *Seabrook Foods, Inc. v. Bar–Well Foods, Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977):

> [W]hether [the trade dress is] a "common" basic shape or design, whether it [is] unique or unusual in a particular field, whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or whether it [is] capable of creating a commercial impression distinct from the accompanying words.

*Id.* at 1344 (quoted in *Jaret International, Inc. v. Promotion In Motion, Inc.*, 826 F.Supp. 69, 75 (E.D.N.Y.1993)). Central Tools' trade dress is incapable of conveying an immediate knowledge of its origin to the viewer; rather, it is a refinement of a common type of packaging. Hundreds of tool companies put their products in blow-molded plastic boxes, and Snap-on and CDI join the parties to this matter in using form-fitted interiors. With the possible exception of the red trapezoidal magnet included in the model 6405 and 6410 sets,[7] each element of Central Tools' trade dress is unremarkable. Dial indicators find uses in many industries, and the Flex–Arms and Vise Grips are made by other companies and thus cannot point to Central Tools as the manufacturer of origin. Therefore, the Court does not find Central Tools' trade dress to be inherently distinctive.

■ However, the Court finds that Central Tools' trade dress is descriptive (for lack of a better term). The elements of Central Tools' models 6405, 6410, or 6450 are arranged in a way that automatically conveys knowledge of their nature and purpose. The purchaser immediately sees the face of the dial, the attachments and magnet or Vise Grip pliers; the form-fitted interior tells the purchaser which parts belong with the set and which are missing. At the same time, the layout of the parts, the shape of the magnet and the array of blue, black, and red colors give each set a certain look, a sense of design and intentionality that transcends the simple presentation of parts. On the sliding scale between generic and fanciful, Central Tools' trade dress clearly lies in the middle, where ornamentation is subtle but effective, an individualization of the common.

■ Next, the Court finds that Central Tools' trade dress has acquired distinctiveness or secondary meaning. The First Circuit has defined secondary meaning as "a word's, or a sign's, ability to tell the public that the word or sign serves a special trademark function, namely, that it denotes a product or service that comes from a particular source." *DeCosta v. Viacom International, Inc.*, 981 F.2d 602, 606 (1st Cir.1992), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982). When seeking to prove secondary meaning, Central Tools faces a rigorous, even difficult, evidentiary standard. *Boston Beer Co.*, 9 F.3d at 181. To determine whether Central Tools has met its burden, the Court will consider "(1) the length

---

7. Central Tools has submitted its USPTO application for the red trapezoidal magnet as Declaration of Alec B. Dawson, Exh. 17. Central Tools argues that the USPTO's preliminary finding of distinctiveness for the magnet automatically translates into a finding of inherent distinctiveness for its entire trade dress. Products Engineering and Fowler respond by moving to strike the entire USPTO file, on a variety of evidentiary grounds.

The Court disagrees with Central Tools' argument that a distinctive part equals a distinctive whole. The Court's inquiry into distinctiveness requires that the elements of Central Tools' trade dress be evaluated *together*, whatever their individual aspects may be. Thus, the Court will consider the shape and color of the trapezoidal magnet only insofar as they add, or detract, from the overall impression conveyed by Central Tools' packaging. It is *the relationship* between the elements that is of interest to the Court. Therefore, the distinctiveness of the trapezoidal magnet alone is irrelevant; the USPTO file has been disregarded. The Court does not reach the motion to strike.

and manner of [the trade dress's] use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between that name or mark and a particular product or venture." *Wheeler*, 814 F.2d at 816 (quoting *Volkswagenwerk AG v. Rickard*, 492 F.2d 474, 478 (5th Cir.1974)). The Court may also infer secondary meaning from evidence that "the trade dress of a product has been copied down to the smallest detail." *TEC Engineering Corp. v. Budget Molders Supply, Inc.*, 927 F.Supp. 528, 534 (D.Mass.1996).

 The Court concludes that the evidence put forth by Central Tools supports a finding of acquired distinctiveness. The question is a close one; Central Tools submits no direct evidence that consumers associate the trade dress of models 6405, 6410, and 6450 with its source. *See, e.g. Boston Beer Co.*, 9 F.3d at 182–83 (consumer survey evidence deemed a well-recognized vehicle for establishing secondary meaning); *Marie–Binucci v. Adam*, 907 F.Supp. 29, 32 (D.Mass.1995) (same).[8] Nevertheless, Central Tools adopted the trade dress of models 6405, 6410, and 6450 in 1982. For six years it was the sole user of the dress, during a period when the company had attained a near-monopoly over the supply of tools to the automotive aftermarket. (In 1987, just before Products Engineering and Fowler entered the market, Central Tools' market share was approximately 80 percent.) During that time, Central Tools directed its marketing and promotional efforts almost exclusively at the automotive aftermarket, through catalog houses, retail outlets, and other distributors. As dial indicator sets represented 40 to 50 percent of Central Tools' sales, the Court will infer that a substantial percentage of Central Tools' pro-

motional efforts involved dial indicator sets. These efforts also took place at a time when Central Tools was demonstrating a desire to promote itself as well as its products—the company's adoption of a uniform trade dress in 1982, after years of haphazard packaging, served to tie its disparate wares to a single source, to gather all its goods under the same tent. Similarly, it is logical to infer that purchasers within the automotive aftermarket associated Central Tools' trade dress with its origin, if only because of the company's dominant position in the market.

Last, Central Tools has submitted evidence that when Products Engineering and Fowler began production and marketing of the cognate sets, in 1988, they copied Central Tools' sets. The instructional pamphlets for Central Tools' model 6410 and the Fowler 1″ range dial indicator set contain the same awkward typographical error, and the Fowler cognates to Central Tools' models 6405 and 6410 have an identically shaped trapezoidal magnet. "[E]vidence of copying is probative, but not determinative, of secondary meaning[,]" 2 *McCarthy on Trademarks* § 15.12[2], and the Court will treat it as such. But added to the other factors, it becomes compelling. Hence, the Court finds that the trade dress used by Central Tools on their models 6405, 6410, and 6450 had acquired distinctiveness by 1988, when Products Engineering and Fowler produced their cognate sets.

 The Court also finds that Central Tools' trade dress is non-functional. "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories*, 456 U.S. at 851 n. 10, 102 S.Ct. at 2187 n. 10. An element of a trade dress is non-functional if it is an arbitrary decoration intended to distin-

---

8. Central Tools submits the Declaration of Jack Manalli and the Declaration of William E. Green, III as evidence that the automotive aftermarket associated Central Tools' trade dress with its origin. Both men state, "It has been my experience that the Automotive Aftermarket generally associates the color combinations described above with Central Tools." Declaration of Jack Manalli at ¶ 10; Declaration of William E. Green, III at ¶ 9. Defendants move to strike these specific paragraphs.

The proffered statements are bald and conclusory, offering little or no evidentiary basis for their assertions. The declarations suggest no reasons why two men should speak for an entire industry; similarly, the use of identical language by both men causes the Court to doubt the impartiality, and credibility, of the declarants. Therefore, the specific paragraphs have been disregarded. The motion to strike is not reached.

guish the product from its competitors, unrelated to the product's use. *TEC Engineering Corp.*, 927 F.Supp. at 533. Products Engineering and Fowler, of course, contend that the blue, blow-molded plastic box, the black latch and the red covering on the magnet are purely functional, integral to the use and maintenance of the dial indicator set. However, the Court notes that 1) Central Tools' packaging is unrelated to the "cost or quality" of the dial indicator sets (the company could have used wood or cardboard boxes with foam interiors); 2) the layout of the dial indicator sets, while affected by the constraints on space, was not dictated by the shape of the pieces; 3) the selection of colors for the box, latch, and magnet cover·is unrelated to the functions served by the sets; and 4) the shape of the magnet does not change its function, but rather distinguishes it from those used by others (e.g., the Verdict Gage magnet, which is a red cylinder). No nexus exists between Central Tools' trade dress and the uses to which purchasers put the model 6405, 6410, and 6450 sets. The Court deems Central Tools' trade dress to be nonfunctional.

The Court concludes that Central Tools' trade dress merits protection under § 43(a) of the Lanham Act.

*4. The Likelihood of Confusion Between Central Tools' and Products Engineering and Fowler's Trade Dress*

▌ To impose liability on Products Engineering and Fowler under the Lanham Act, Central Tools must demonstrate that prospective purchasers of the parties' dial indicator sets are likely to be confused by the parties' similar dress. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757. The First Circuit has named eight factors that must be evaluated when assessing the likelihood of confusion:

(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*Star Financial Services, Inc. v. Aastar Mortgage Corp.*, 89 F.3d 5, 10 (1st Cir.1996); *DeCosta*, 981 F.2d at 606; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 (1st Cir. 1989). "None of these factors is necessarily controlling, but all of them must be considered." *Star Financial Services*, 89 F.3d at 10.

**a. The Similarity of the Marks**

The trade dress used by Central Tools on its model 6405, 6410, and 6450 dial indicator sets is nearly identical to the trade dress adopted by defendants on their cognate sets, with one critical exception. Central Tools and Fowler clearly label their products. Central Tools applies its logo to the white cardboard sleeve in which the set travels, to the outside of the blue box, and on the face of the dial. Similarly, Fowler puts the Fowler name on the top of the plastic case and on the dial, where purchasers will see it as they take measurements. The Court considers the application of an obvious logo, trademark, or label to weigh heavily against a finding of likelihood of confusion. *See Copy Cop, Inc. v. Task Printing, Inc.*, 908 F.Supp. 37, 45 (D.Mass.1995) (quoting *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983)) (use of trade name diminishes likelihood of confusion); *Conopco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556, 1568 (Fed.Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1724, 131 L.Ed.2d 582 (1995) ("conspicuous and permanent placement of the trademarks" of plaintiff and defendant, in conjunction with other factors, negates possibility of consumer confusion); *Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 71 (2nd Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995) ("conspicuous use of very different logos" distinguishes the parties' trade dresses); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1045–46 (2nd Cir.1992) ("[T]he prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion[.]")

**b. The Similarity of the Goods**

For all intents and purposes, each of the cognate sets produced by defendants is iden-

tical to Central Tools' models 6405, 6410, or 6450. This factor supports a finding of likelihood of confusion.

### c. The Relationship Between the Parties' Channels of Trade; The Relationship Between the Parties' Advertising; The Classes of Prospective Purchasers [9]

Central Tools and Fowler target the same automotive aftermarket with their dial indicator sets; the sets are designed specifically for use on automobiles. Both companies sell to other distributors in the market, although Central Tools also sells to retail outlets and catalog houses. The firms direct their promotional and advertising efforts at the same target group of purchasers.

The sophistication of the class of prospective purchasers, however, militates against a finding of consumer confusion. The model 6405, 6410, and 6450 dial indicator sets are precision measuring instruments to be used by professionals in the automotive service and repair business. Such purchasers, and the distributors who service them, can be expected to exercise care when buying their tools, and not to be confused easily. *See Conopco,* 46 F.3d at 1568 (sophistication of purchasers weighs against consumer confusion).

### d. The Evidence of Actual Confusion

Central Tools presents no evidence that any consumer, at the distributor or retail level, intended to buy a Central Tools model 6405, 6410, or 6450 dial indicator set and mistakenly purchased defendant's product because he or she confused the two trade dresses. There were no erroneous returns of the Fowler cognate models to Central Tools. Similarly, plaintiff has not produced consumer surveys or other evidence that would indicate that confusion exists among the purchasing public. Instead, Central Tools puts forth the mysterious Messrs. Green and Manalli, who again parrot each other:

> The manufacture and/or sale of dial indicator sets, as described above, by Defendants has confused me specifically and the

Automotive Aftermarket generally, in that when I see Defendants' products, I mistakenly believe the source to be Central Tools. Declaration of William E. Green, III at ¶ 10; Declaration of Jack Manalli at ¶ 11. The Court need not consider defendants' motion to strike portions of the above quote; what Green and Manalli have to say is largely irrelevant to this matter. Neither declarant states that he, or anyone else in the "Automotive Aftermarket," ever made the mistake of buying a dial indicator set from Fowler while believing that it was made by Central Tools. Thus, as evidence of actual confusion among *purchasers,* the Green and Manalli declarations are worthless. Central Tools' inability to show actual confusion between the parties' trade dresses, despite their use in the automotive aftermarket from 1988 to the present, leans away from the likelihood of confusion.

### e. The Defendant's Intent in Adopting its Mark

"Intentional copying gives rise to a strong presumption that confusion was likely." *Three Blind Mice Designs Co., Inc. v. Cyrk, Inc.,* 892 F.Supp. 303, 312 (D.Mass.1995). Products Engineering and Fowler clearly copied the model 6410 instructional pamphlets. Their adoption of the trapezoidal magnets, after Snap-on asked Fowler to procure cognate sets, indicates that they copied Central Tools' instruments as well. The Court awards this factor to plaintiff.

### f. The Strength of Plaintiff's Mark

 The strength of Central Tools' trade dress is determined by consideration of, *inter alia,* the length of time the mark has been used; the company's renown in the field; the strength of the mark within the applicable market when compared with other, similar marks; and the company's actions to promote and protect its mark. *Three Blind Mice,* 892 F.Supp. at 312; *Boston Athletic Ass'n,* 867 F.2d at 32.

On balance, Central Tools' trade dress must be considered only moderately strong. The company enjoyed exclusive use of its

---

**9.** These three factors are customarily analyzed together. *Equine Technologies, Inc. v. Equitech-* *nology, Inc.,* 68 F.3d 542, 546 n. 5 (1st Cir.1995).

trade dress from 1982 to 1988, a period when it was the dominant market player and possessed substantial renown. However, hundreds of other companies, both within the automotive aftermarket and without, use similar blow-molded plastic packaging. When compared with the boxes used by Snap-on, Verdict Gage, CDI and defendants, Central Tools' trade dress appears to be the simple ornamentation of a mundane and unremarkable product. A blue cover, a black latch, a red trapezoidal magnet—such elements are neither inherently distinctive nor impressive. Central Tools *has* promoted itself and its products through the use of uniform packaging; yet the company appears to have made little effort to protect its trade dress during the early years of defendants' alleged infringement.

The Court considers the moderate strength of Central Tools' trade dress to be a neutral, or a slightly pro-plaintiff, factor in the likelihood of confusion calculus.

### g. Conclusion

Weighing all the factors, the Court concludes that there is no likelihood of confusion between the trade dress used by Central Tools on its model 6405, 6410, and 6450 sets, and that used by defendants on their cognate products. The fact that Fowler clearly labels the sets manufactured by Products Engineering, together with the absence of evidence of actual confusion, defeats the strength of the mark and the presumption raised by defendants' copying. In turn, the sophistication of the consumers cancels out the similarity of the goods—the purchasers can be expected to know their tools. The competing dial indicator sets have been in the market for eight years, without anyone ever showing confusion over their origins.

As the Court finds no likelihood of confusion, the defendants are not liable under § 43(a) of the Lanham Act. Summary judgment is granted to defendants on Count I.

### B. Counts II, III & IV: Claims Under New York Law

Central Tools, Products Engineering, and Fowler agree that the state law claims brought pursuant to N.Y.Gen.Bus.Law

§§ 349 and 368–d and the common law "stand or fall, along with the Lanham Act claim." Mem. in Support of Pl. Cross Motion for Summary Judgment at 38; Mem. in Support of Def. Motion for Summary Judgment at 33. The Court finds that defendants are not liable to Central Tools under the Lanham Act, and therefore concludes that Products Engineering and Fowler escape liability under New York state law as well. Summary judgment is granted to the defendants on Counts II, III and IV of the Complaint.

### C. Count V: The Sherman Act Claim

Count V of the Complaint alleges that Products Engineering and Fowler conspired in restraint of trade, thus violating § 1 of the Sherman Act, 15 U.S.C. § 1 (1990). Central Tools subsequently informed the Court that it intended to withdraw its Sherman Act claim, Mem. in Support of Pl. Cross Motion for Summary Judgment at 38, but no order to that effect was presented to the Court. The Court takes Central Tools at its word and dismisses Count V of the Complaint.

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment on Counts I, II, III and IV of the Complaint is granted, and plaintiff's cross motion for summary judgment is denied. Count V is hereby dismissed. The Court does not reach defendants' motion to strike. The Clerk shall enter judgment for defendants forthwith.

It is so ordered.